Eric J. Buescher (Bar No. 271323)
eric@baykeeper.org
M. Benjamin Eisenberg (Bar No. 270893)
ben@baykeeper.org
**SAN FRANCISCO BAYKEEPER**
1736 Franklin Street, Suite 800, Oakland, CA
Phone: (510) 735-9700

Robert S. Perlmutter (Bar No. 183333)
perlmutter@smwlaw.com
**SHUTE, MIHALY & WEINBERGER LLP**
396 Hayes Street, San Francisco, CA 94102
Phone: (415) 552-7272

*Attorneys for Plaintiff*
SAN FRANCISCO BAYKEEPER

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SAN FRANCISCO BAYKEEPER**, a California non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>**AMPORTS, INC.**, a Delaware Corporation; **APS WEST COAST, INC.**, a Delaware Corporation; **BENICIA PORT TERMINAL COMPANY**, a Delaware Corporation; and **VALERO REFINING COMPANY – CALIFORNIA,** a Delaware Corporation<br><br>Defendants. | Civil Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>1. **Clean Water Act – Illegal Discharge of Pollutants**<br>2. **Clean Water Act -- Failure to apply for NPDES Permit**<br>3. **Clean Water Act – Failure to comply with NPDES Permit**<br>4. **Clean Water Act – Illegal Storm Water Discharge**<br>5. **Clean Water Act – Storm Water Discharges without Complying with Technology Based Effluent Limitations**<br>6. **Clean Water Act – Discharges of Storm Water in Violation of Receiving Water Limitations**<br>7. **Clean Water Act – Failure to Have a Valid Storm Water Pollution Prevention Plan**<br>8. **Clean Water Act – Failure to Conduct Monitoring and Reporting**<br>9. **Clean Water Act – Failure to Perform Annual Comprehensive Review of Storm Water Discharges**<br>10. **Unfair Competition Law – Unlawful Conduct under Bus. & Prof. Code § 17200** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 5

II.   JURISDICTION AND VENUE ........................................................................... 7

III.  PARTIES ............................................................................................................. 8

   A.   Plaintiff San Francisco Baykeeper ................................................................ 8

   B.   Defendants ................................................................................................... 10

       1.   The Amports Entities ............................................................................ 10

       2.  Valero ..................................................................................................... 12

IV.  LEGAL AND REGULATORY BACKGROUND ............................................ 12

   A.   California Law Prohibits the Deposition and Potential Deposition of Any Petroleum Substance to California's Waters .............................................. 12

   B.   The Clean Water Act Prohibits Discharges of Pollutants like Petcoke without a Valid Permit... 13

   C.   Storm Water Pollution Causes Significant Harm ....................................... 15

   D.   California's General Permit ......................................................................... 15

       1.   Technology-Based Effluent Limitations .............................................. 17

       2.   Receiving Water Limitations ................................................................ 19

       3.   The Storm Water Pollution Prevention Plan ....................................... 21

       4.   The Monitoring Implementation Plan .................................................. 22

       5.   The Annual Comprehensive Facility Compliance Evaluation ............. 24

V.   FACTUAL ALLEGATIONS ............................................................................. 24

   A.   The Facility ................................................................................................. 24

   B.   The Petcoke Operation at the Facility Causes Direct Discharges of Pollutants into the Carquinez Strait .............................................................. 25

   C.   Defendants Discharge Petcoke Laden Stormwater Associated with Industrial Activities .......... 27

Complaint for Declaratory and Injunctive Relief        2
and Civil Penalties

D.    Amports Does Not Have any Valid NPDES Permit for its Direct and Indirect Discharges, is not Covered by the General Permit, and Does not Comply with the General Permit's Requirements ...... 30

E.    Valero's NPDES Permit for its Refinery Operations Does Not Allow the Discharge of Petcoke into the Water....................................................................................................................... 30

VI.   CLAIMS FOR RELIEF ................................................................................................... 31

FIRST CAUSE OF ACTION Discharges of Pollutants to Waters of the United States without NPDES Permit Coverage in Violation of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1365(a), and 1365(f)................................................................................................................ 31

SECOND CAUSE OF ACTION Failure to Apply for NPDES Permit Coverage (Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342) ................................... 32

THIRD CAUSE OF ACTION Failure to Comply with the Terms of an NPDES Permit (Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342) .......................... 33

FOURTH CAUSE OF ACTION Discharges of Storm Water from Industrial Activity to Waters of the United States without Complying with the General Permit in Violation of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f) ......................................................... 35

FIFTH CAUSE OF ACTION Discharges of Contaminated Storm Water to Waters of the United States without Complying with Technology Based Effluent Limitations in Violation of the General Permit and the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f) .... 36

SIXTH CAUSE OF ACTION Discharges of Contaminated Storm Water in Violation of the General Permit's Receiving Water Limitations and the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f) ................................................................................................. 37

SEVENTH CAUSE OF ACTION Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the General Permit and Clean Water Act, 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f) .................................................................. 38

EIGHTH CAUSE OF ACTION Failure to Adequately Develop, Implement, and/or Revise a Monitoring Implementation Program in Violation of the General Permit and the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f) .............................................................. 39

NINTH CAUSE OF ACTION Failure to Complete Annual Compliance Evaluations as Required by the General Permit in Violation of the General Permit and the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f) ............................................................ 40

TENTH CAUSE OF ACTION Violation of Unfair Competition Law, Cal. Bus. & Prof. Code § 17200............................................................................................................................. 41

VII. PRAYER FOR RELIEF ........................................................................................................ 42

## I.   **INTRODUCTION**

1.      Federal law prohibits the discharge of pollutants into waters of the United States without a valid permit, and California law prohibits the discharge of petroleum into its jurisdictional waters. Defendants Amports, Inc., APS West Coast, Inc., and Benicia Port Terminal Company (collectively, "Amports"), and Defendant Valero Refining Company ("Valero," and with Amports, "Defendants") directly discharge petroleum coke into the Carquinez Strait at the Port of Benicia. Defendants do so without a valid permit under the Clean Water Act and in violation of California law. San Francisco Baykeeper brings this lawsuit to put an end to Defendants' ongoing illegal conduct.

2.      Petroleum coke, or petcoke, is a byproduct of petroleum refining. Petcoke dust is small particulate matter that is visible in the air, on the ground or other surfaces, and when it enters the water appears as an oil-like sheen stretching across the surface. Petcoke is harmful and deleterious to aquatic ecosystems, animal and plant species in and around waters, and poses risks to human health.

3.      Amports leases the Port of Benicia, including adjacent submerged tidelands, from the City of Benicia (the "Port" or "Facility"). Among the activities at the Port is petcoke storage and ship loading. When a ship is in the Port to be loaded with petcoke, Amports transports the petcoke from storage silos, up a conveyor, into a crane, and then out of a nozzle into the cargo hold of the ship. During that process, in addition to entering the ship's cargo hold, petcoke is discharged: directly into the Carquinez Strait as overspray; onto the deck of the ship and the nearby wharf as overspray; indirectly into the Carquinez Strait, onto the ship, and onto the wharf from plumes of petcoke that escape from the ship's cargo hold due to remobilization; into the Carquinez Strait nearby the Facility, onto the ship, and onto the wharf after travelling in plumes through the air; and onto the Facility and eventually into storm water systems and the Bay during rain events. In addition, once full (requiring several iterations of the loading process), the ship is hosed down and the petcoke on the ship is washed directly into the Carquinez Strait. The Amports Defendants pay the employees who do the loading work, both at the Port and on the ship.

4.      The discharge of petcoke into the Carquinez Strait causes harm to Baykeeper and its members. Baykeeper's members live near, recreate near, and use the waters of the Carquinez Strait and nearby connected San Pablo Bay and Suisun Bay.

Complaint for Declaratory and Injunctive Relief
and Civil Penalties

5.      At the Port, Amports' activities specifically generate discharge of pollutants. These include, but are not limited to: (1) loading of ships at the Facility during standard operating processes; (2) direct spray from the conveyance system when the crane boom is being disengaged and raised while petcoke and pollutants continue to be discharged causing overspray onto the water, wharf, and ship deck; (3) the washing of petcoke and pollutants off the deck of the ship and other loading-related equipment, directly into the Bay; (4) direct aerial deposition of particulate matter into the water from Amports' conveyance system and operations; (5) offloading of train cars at the Facility; (6) moving petcoke around the Facility; (7) equipment and vehicle cleaning, maintenance, and repair at the Facility, and (8) by deposition of particulate matter that travels from the loading Facility, equipment, and machinery, through the air, into jurisdictional waters, including petcoke that initially enters the ship's cargo hold, but is reanimated and escapes into the air and eventually water.

6.      The petcoke that does not directly enter and remain in the cargo hold, but instead enters the Carquinez Strait, constitutes the illegal discharge of pollutants under both state and federal law. Baykeeper has documented on video numerous discharges of petcoke into the Carquinez Strait. During loading, petcoke enters the water, accumulates, and drifts away from the Port in the tide.



Complaint for Declaratory and Injunctive Relief
and Civil Penalties                6

7.    Defendants' conduct is ongoing. When a ship is loaded, illegal pollution enters San Francisco Bay. Absent declaratory and injunctive relief, Defendants will keep polluting the Carquinez Strait with petcoke, Baykeeper and its members will continue to be harmed, and the obvious and visible pollution the petcoke loading operation causes will remain.

8.    Defendants' conduct violates state and federal law, and this Court can and should enjoin its illegal deposit and discharge of pollutants into the Bay Area's waters.

9.    Baykeeper seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's repeated and ongoing violations.

## II.    JURISDICTION AND VENUE

10.    This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "Act"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. section 1365(a)(1) and 28 U.S.C. sections 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

11.    Baykeeper also brings claims under California Business and Professions Code section 17200 to enjoin Amports' conduct which is unlawful and in violation of California Fish and Game Code section 5650. This Court has supplemental jurisdiction over this claim under 28 U.S.C. section 1367.

12.    On October 4, 2021, Baykeeper sent a 60-day notice letter ("Notice Letter") to Amports. The Notice Letter informed Amports of their violations of the Clean Water Act at the Port and of Baykeeper's intention to file suit. A copy of the Notice Letter is attached as Exhibit A and is incorporated herein by reference. On December 20, 2021, Baykeeper sent a second 60-day notice letter ("Second Notice Letter"). The Second Notice Letter was sent to Amports and to Valero. The Second Notice Letter informed all Defendants of the ongoing violations of the Clean Water Act at the Port and of Baykeeper's intention to file suit. A copy of the Second Notice Letter is attached as Exhibit B and is incorporated herein by reference.

13.    The Notice Letter was sent to the registered agent for Amports, Inc. as well as to Amports, Inc.'s Benicia, California and Jacksonville, Florida offices. The Second Notice Letter was sent

to all three Amports entities, to their registered agents, to both the Benicia and Jacksonville offices of the Amports entities, and to the registered agent of Valero Refining Company – California, to the San Antonio headquarters of Valero, and to the refinery's Director of Health, Safety, Environmental and Regulatory Affairs in Benicia.

14.     In addition, a copy of both the Notice Letter and Second Notice Letter were sent to the U.S. Department of Justice, the Administrator of the U.S. Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA for Region 9, the State Water Resources Control Board, and the San Francisco Bay Regional Water Quality Control Board (together, the "State and Federal Agencies"), as required by the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A).

15.     More than sixty (60) days have passed since the Notice Letter and Second Notice Letter were served on Amports, Valero, and the State and Federal agencies.

16.     Baykeeper is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. No claim in this action is barred by any prior administrative action under section 309(g) of the Act, 33 U.S.C. § 1319(g).

17.     Venue is proper in the Northern District of California pursuant to section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

18.     Intradistrict assignment of this matter to the San Francisco Division or the Oakland Division of the Court is appropriate pursuant to Civil Local Rule 3-2(d). The events or omissions which give rise to Baykeeper's claims occurred in Solano County, which is under the jurisdiction of the San Francisco or Oakland Divisions of the Northern District of California.

## III.    PARTIES

### A.    Plaintiff San Francisco Baykeeper

19.     Baykeeper, d/b/a/ San Francisco Baykeeper is a non-profit public benefit corporation organized under the laws of the State of California with its office located at 1736 Franklin Street, Suite 800, Oakland, California, 94612. Baykeeper acts on behalf of its approximately 3,500 members who live and/or recreate in and around the San Francisco Bay Area. Baykeeper's mission is to defend San

Francisco Bay from the biggest threats and hold polluters and government agencies accountable to create healthier communities and help wildlife thrive. Its team of scientists and lawyers investigate pollution via aerial and on-the-water patrols, strengthen regulations through science and policy advocacy, and enforce environmental laws on behalf of the public. To further its mission, Baykeeper actively seeks federal and state agency implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

20.     Members of Baykeeper reside in Benicia, California, as well as in many of the surrounding communities. Members of Baykeeper, including citizens, taxpayers, property owners, and residents live, work, and travel near San Francisco Bay and its tributaries, into which Amports discharges pollutants. Baykeeper's members and supporters use and enjoy San Francisco Bay and other waters for various recreational, educational, and spiritual purposes. Baykeeper's members' use and enjoyment of these waters are negatively affected by the pollution caused by the Facility's operations.

21.     Specifically, Baykeeper members use the area around the Facility in the Carquinez Strait and nearby San Francisco Bay to bird watch, view wildlife, fish, kayak, sail, boat, stand up paddleboard, wade and swim, hike, bike, walk, run, and sightsee, as well as for aesthetic enjoyment. Additionally, Baykeeper and its members use local waters to engage in educational and scientific study through pollution and habitat monitoring and restoration activities.

22.     The Facility's historic and ongoing discharge of pollutants into the Carquinez Strait in violation of the Clean Water Act have, are, and continue to adversely affect the interests of Baykeeper and its members.

23.     The interests of Baykeeper's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Clean Water Act and California law. The relief sought herein will redress the harms to Plaintiff caused by Defendants' activities.

24.     Baykeeper has one or more members who use, explore, and recreate in areas impacted by the pollution herein at issue and could sue in their own right.

25.     Baykeeper brings this action on behalf of itself and its members. None of the claims brought by Baykeeper nor the relief Baykeeper requests requires the participation of individual members.

Complaint for Declaratory and Injunctive Relief                    9
and Civil Penalties

26.     Baykeeper's injuries-in-fact are fairly traceable to Defendants' conduct and would be redressed by the requested relief.

27.     Baykeeper's work includes a long-term campaign to rid the San Francisco Bay of fossil fuel pollution, including working specifically on petcoke related issues for over a decade. Baykeeper's mission includes not only litigation, but also investigative work. Baykeeper investigates reports of pollution from the public to document problems, identify sources of pollution, and determine how best to address them. Baykeeper takes actions on these matters, including referral to regulatory agencies, coordination with other non-profit groups, and sometimes litigation. Baykeeper also conducts advocacy work related to petcoke, including in Richmond and elsewhere.

28.     Defendants' petcoke pollution frustrates Baykeeper's mission. Baykeeper has diverted its limited resources to investigate, research, gather documents from regulatory agencies, and consult with experts in order to understand the causes and consequences of Defendants' ongoing pollution from the Port into and around the Carquinez Strait. Baykeeper has dedicated substantial resources and time into its work and investigation regarding Amports, Valero, and petcoke pollution at the Port. At the time Baykeeper undertook its investigation into the Port, the resources spent were not related to any litigation. Baykeeper would have used its limited resources on other matters had it not been for Defendants' conduct.

29.     Continuing commission of the acts and omissions alleged herein will cause irreparable harm to Baykeeper and its members, for which there is no adequate remedy at law.

**B.     Defendants**

   *1.     The Amports Entities*

30.     Defendant Amports, Inc. is a Delaware corporation headquartered in Jacksonville, Florida. Amports, Inc. is registered to do business in California. Amports, Inc. is a holding company that owns Defendants APS West Coast, Inc. and Benicia Port Terminal Company. Amports, Inc.'s main office is located at 10060 Skinner Lake Drive, Jacksonville, Florida, 32246. Its California office is located at 1997 Elm Road, Benicia, California, 94510. Amports, Inc.'s CEO is Stephen Taylor, its Secretary and CFO is Jacob Brown, and its Controller is Kimberly Dymond.

31.     Defendant APS West Coast, Inc. is a Delaware corporation headquartered in Jacksonville, Florida. APS West Coast, Inc. is registered to do business in California. APS West Coast Inc. has offices in both Jacksonville, FL and Benicia, CA at the same locations as Amports, Inc. APS West Coast, Inc. has the same CEO, CFO, Secretary, and Controller as Amports. Upon information and belief, APS West Coast, Inc. does business as "Amports."

32.     Defendant Benicia Port Terminal Company is a Delaware corporation, headquartered in Jacksonville, Florida, and registered to do business in California. Amports, Inc. is the owner of the Benicia Port Terminal Company. Upon information and belief, Benicia Port Terminal Company operates the Port, including hiring and paying the longshoreman who work on the ships. Benicia Port Terminal Company has offices in both Jacksonville, FL and Benicia, CA at the same location as Amports, Inc. and APS West Coast, Inc. Benicia Port Terminal Company has the same CEO, CFO, Secretary, and Controller as Amports, Inc. and APS West Coast, Inc.

33.     Upon information and belief, Amports operates the Port of Benicia Terminal as a private port. APS West Coast, Inc. leases the Port from the City of Benicia. The lease of the Port includes dry lands as well as the tidal and submerged lands. The lease is currently set to continue until after 2030. Upon information and belief, Valero has a sublease from APS West Coast, Inc. for a portion of the site, which includes the petcoke storage silos and petcoke loading equipment.

34.     Generally, operations at the Port consist of unloading of imported vehicles, parking of those vehicles, transferring shipments of petcoke from the Valero refinery via railcar into storage silos, and a conveyor and crane to load petcoke into cargo ships.

35.     The Facility is located along the Carquinez Strait, just west of the Benicia-Martinez Bridge on Interstate Highway 680. There are two addresses commonly used for the Facility, 1997 Elm Road and 1270 Bayshore Road, both in Benicia, California, 94510.

36.     The Facility is a roughly 400-acre site which includes marine cargo loading equipment, the petcoke loading equipment and conveyor system, parking for cars, docking area and equipment for ships, silos to store petcoke, train car petcoke offloading area and equipment, vehicle maintenance, equipment cleaning, ship cleaning, ship maintenance, and other facilities. According to Amports' 2015 Notice of Intent to comply with the General Permit under the Clean Water Act, at least eight acres at the

Facility consisted of areas that were exposed to storm water. The 2015 Notice of Intent to comply was terminated by Amports in 2017. Upon information and belief, more than eight of the 400-acres at the Facility are exposed to storm water.

### 2. Valero

37.    Defendant Valero Refining Company – California is a Delaware Corporation, headquartered in San Antonio, Texas, and registered to do business in California. Valero is the owner and operator of the Valero Refinery, located at 3400 East Second Street, Benicia, California, 94510. The petcoke being discharged at the Port is manufactured by Valero at the Valero Refinery. Rail cars transport the petcoke from the Valero Refinery to the Port of Benicia Terminal where the petcoke is transferred to silos for storage prior to loading.

38.    When, in this complaint, reference is made to any act of the Defendants, such allegations shall be deemed to mean that the officers, directors, agents, employees, or representatives of said defendants did, or authorized such acts, or failed to adequately or properly supervise, control, or direct their employees and agents while engaged in the management, direction, operation, or control of the affairs of said business organization, and did so while acting in the scope of their employment or agency.

## IV.    LEGAL AND REGULATORY BACKGROUND

### A.    California Law Prohibits the Deposition and Potential Deposition of Any Petroleum Substance to California's Waters

39.    The illegal discharge of petroleum or petroleum products is harmful and deleterious to water, wildlife, and people. In regulating or legislating around waters of the state of California, the state has broad authority to protect fishery resources and water quality, and the legislature has used the broadest possible language to effectuate the purpose of the law to protect wildlife resources from petroleum pollution.

40.    For all petroleum and residuary products of petroleum, California Fish and Game Code section 5650 makes it unlawful to (1) deposit in, (2) permit to pass into, or (3) place where such products can pass into the waters of the state of California. *See* Fish & Game Code § 5650(a)(1). Petroleum and its byproducts may only be discharged if it is expressly authorized by and in compliance

with a waste discharge requirement, a waiver of a permit, a valid permit under the Clean Water Act or state law, or a water quality certification. *See id.* § 5650(b). Section 5650 is a strict liability statute designed to protect the waters of California from the deleterious and harmful effects of petroleum and other pollution.

41.     California's Unfair Competition Law, California Business and Professions Code section 17200, bars any business activity that is (1) unlawful, (2) unfair, or (3) fraudulent. A business activity is "unlawful" under the statute if the conduct violates any other state law. A violation of Fish and Game Code section 5650(a) is unlawful conduct under Business and Professions Code section 17200. An injured plaintiff, like Baykeeper, may obtain an injunction under section 17200 to stop ongoing unlawful conduct.

**B.     The Clean Water Act Prohibits Discharges of Pollutants like Petcoke without a Valid Permit**

42.     The Clean Water Act is the primary federal statute protecting surface waters in the United States. The Act aims to prevent, reduce, and eliminate pollution in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

43.     In order to accomplish that goal, section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharger complies with other enumerated sections of the Act, including the prohibition on discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to section 402, 33 U.S.C. § 1342(b). *See also* 40 C.F.R. § 122.26(c)(1) and General Permit, § I.A.12.

44.     The Act requires all point source discharges of pollutants to waters of the United States be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

45.     The "discharge of a pollutant" means, among other things, the addition of a pollutant to "waters of the United States" from any "point source." 40 C.F.R. § 122.2.

46.     The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); 40 C.F.R. § 122.2.

47.     The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

48.     Each discharge of a pollutant without a valid permit is a violation of the Clean Water Act.

49.     Section 505(a)(1) of the Act provides for citizen enforcement against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. §§ 1365(a)(1), 1365(f).

50.     A "person" under the Act includes individuals, corporations, partnerships, associations, States, municipalities, commissions, and political subdivisions of a State, or any interstate body. 33 U.S.C. § 1362(5). Defendants are persons under the Act.

51.     "Effluent standard or limitation" is defined to include: (a) the prohibition in section 301(a) against unpermitted discharges; and (b) any condition of an NPDES permit such as the General Permit. 33 U.S.C. § 1365(f); *Citizens for a Better Env't v. Union Oil Co.*, 83 F.3d 1111, 1114 (9th Cir. 1996) ("Private citizens may bring suit pursuant to 33 U.S.C. § 1365 to enforce effluent standards or limitations, which are defined as including violations of 33 U.S.C. § 1311(a). 33 U.S.C. § 1365(f)(1).").

52.     Pursuant to section 309(d) of the Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate statutory violation subjects the violator to penalties of up to $56,460 per day per violation for violations occurring after November 2, 2015, where penalties are assessed on or after December 23, 2020.

53.     Section 505(a) of the Act authorizes third-party enforcement actions for injunctive relief. 33 U.S.C. § 1365(a). Section 505(d) allows a prevailing or substantially prevailing party in an enforcement action to recover litigation costs, including fees for attorneys, experts, and consultants where it finds that such an award is appropriate. 33 U.S.C. § 1365(d).

54.     Generally, in California, permits for discharging storm water from industrial operations are issued by the Regional Board either in the form of a site specific NPDES Permit, or through compliance with the statewide Industrial General Permit.

**C.   Storm Water Pollution Causes Significant Harm**

55.   With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, like the Facility, flow into the San Francisco Bay Area's storm drains, local waterways, wetlands and estuaries, San Francisco Bay, Carquinez Strait, Suisun Bay, San Pablo Bay, and the Pacific Ocean.

56.   The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering local creeks, rivers, and coastal waters each year.

57.   The San Francisco Bay, Carquinez Strait, Suisun Bay, San Pablo Bay, and their connected surface waters are ecologically sensitive areas and are essential habitat for numerous cetacean, fish, bird, and other species.

58.   These waters also provide recreational activities, including fishing, swimming, surfing, kayaking, and boating. They also provide non-contact recreational and aesthetic opportunities such as biking, wildlife observation, educational activities, and opportunities for research.

59.   Industrial facilities like Amports' that discharge storm water contaminated with petroleum coke, sediment, particulate matter, dust, heavy metals, and other pollutants contribute to impairment of waters and aquatic dependent wildlife, expose the people of Benicia to toxins, and harm the special social, economic, and aesthetic benefits San Francisco Bay Area waters have for locals and visitors from around the world.

60.   Controlling polluted storm water and non-storm water discharges is essential to protecting the San Francisco Bay Area's surface waters.

**D.   California's General Permit**

61.   Section 402(p) of the Act establishes the framework regulating industrial storm water discharges under federal, and authorized state, NPDES permit programs. 33 U.S.C. § 1342(p).

62.   Discharges composed entirely of storm water are exempt from the Act's permitting requirements unless those discharges are associated with "industrial activity." *See* 33 U.S.C. § 1342(p)(1) and (2); *Natural Res. Def. Council, Inc. v. EPA*, 966 F.2d 1292, 1304-05 (9th Cir. 1992) (detailing EPA's regulations regarding "industrial activity" sources). EPA's implementing regulations at

Complaint for Declaratory and Injunctive Relief          15
and Civil Penalties

40 C.F.R. § 122.26 require NPDES permit authorization for facilities engaged in industrial activity that discharge to waters of the United States.

63.     Section 402(b) of the Clean Water Act, 33 U.S.C. § 1342(b), establishes a framework for regulating industrial storm water discharges under the NPDES program. States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a single, statewide general NPDES permit applicable to all industrial storm water dischargers. *See* 33 U.S.C. § 1342(b).

64.     In California, the State Water Resources Control Board ("State Board") is charged with regulating pollutants to protect California's water resources.

65.     The General Permit is a statewide general NPDES permit issued by the State Board pursuant to section 402 of the Clean Water Act, 33 U.S.C. § 1342(b), and 40 C.F.R § 123.25. The Industrial General Permit Order 2014-0057-DWQ, as amended in 2015 and 2018, as of July 1, 2020, is the currently active General Permit for industrial stormwater discharges applicable in California.

66.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the General Permit and comply with its terms, or obtain and comply with an individual NPDES permit.

67.     The State Board elected to issue a statewide general permit for industrial storm water discharges. The State Board originally issued the General Permit on or about November 19, 1991. The State Board modified the General Permit on or about September 17, 1992. Pertinent to this action, the State Board reissued the General Permit on or about April 17, 1997, and again on or about April 1, 2014, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The current version of the General Permit went into effect on July 1, 2015.

68.     In order to discharge storm water lawfully in California, industrial facilities must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

69.     The General Permit contains several prohibitions. Effluent Limitation V(A) prohibits discharges unless pollutants have been reduced or prevented through implementation of appropriate technological measures. Discharge Prohibition III(C) prohibits storm water discharges and authorized

non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation VI(B) prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.

70.     Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI"). Dischargers have been required to file NOIs since March 30, 1992.

71.     Compliance with the General Permit constitutes compliance with the Act for purposes of storm water discharges. 33 U.S.C. §§ 1311(b)(2)(A), 1311(b)(2)(E). Conversely, "[General] Permit noncompliance constitutes a violation of the Clean Water Act and the [California] Water Code." General Permit, § XXI.A.

## 1.   *Technology-Based Effluent Limitations*

72.     The General Permit requires dischargers to comply with technology-based standards established in the Act. 33 U.S.C. § 1311(b); General Permit, § V.A. The General Permit incorporates these technology-based standards as "Effluent Limitations."

73.     The Effluent Limitations require dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of pollution controls. For toxic and non-conventional pollutants like petcoke, this requires the Best Available Technology Economically Achievable ("BAT"). *See* General Permit, § V.A; *see also* 40 C.F.R. § 401.15 (listing toxic pollutants, including copper, cadmium, chromium, lead, and zinc).

74.     For conventional pollutants this requires the Best Conventional Pollutant Control Technology ("BCT") (collectively, the technology based effluent limitations are referred to as "BAT/BCT"). *See* General Permit, § V.A; *see also* 40 C.F.R. § 401.16 (listing conventional pollutants, including biochemical oxygen demand, total suspended solids, oil and grease, pH, and fecal coliform).

1   The BAT/BCT requirements apply regardless of the quality of water to which a given facility

2   discharges, and set the floor for storm water pollution prevention. *See* General Permit, § I.D.31.

3          75.     Compliance with the BAT/BCT standard requires all dischargers to implement pollution

4   control measures—called Best Management Practices ("BMPs")—that reduce or prevent discharges of

5   pollution in their storm water discharge in a manner that reflects best industry practice. EPA developed a

6   set of benchmark pollutant concentrations that are relevant and objective standards for evaluating

7   whether a permittee's BMPs achieve compliance with the statutory BAT/BCT standard expressed in the

8   General Permit's technology-based Effluent Limitations.

9          76.     EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to

10  evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. *See* United

11  States Environmental Protection Agency NPDES Multi-Sector General Permit for Storm Water

12  Discharges Associated with Industrial Activity, effective June 4, 2015, reissued and modified effective

13  March 1, 2021 ("Multi-Sector General Permit"); *Santa Monica Baykeeper v. Kramer Metals, Inc.*

14  ("*Kramer*"), 619 F. Supp. 2nd 914, 921 (C.D. Cal. 2009); *see also* 86 Fed. Reg. 10269 (Feb. 19, 2021);

15  80 Fed. Reg. 34403 (June 16, 2015); 73 Fed. Reg. 56572, 56574 (Sept. 29, 2008); 65 Fed. Reg. 64746,

16  64766-67 (Oct. 30, 2000).

17         77.     The General Permit's Numeric Action Levels ("NALs"), which are derived from EPA

18  Benchmark values published in the 2008 Multi-Sector General Permit, are objective numeric standards

19  relevant to evaluating whether BMPs designed and implemented at a facility achieve the statutory

20  BAT/BCT standard.

21         78.     The discharge of storm water containing pollutant concentrations exceeding EPA

22  Benchmark targets and/or NALs evidence a failure to develop and implement pollution control

23  strategies that achieve pollutant reductions consistent with the BAT/BCT standard. *Kramer*, 619 F.

24  Supp. 2nd at 921-25; *see also* 80 Fed. Reg. 34403, 34405 (June 16, 2015).

25         79.     EPA's Industrial Stormwater Fact Sheet presents benchmark thresholds for pollutants that

26  may be present at the Facility. 2021 Permit, Fact Sheet Section VII Part 4.2.2.2 (2015 and 2021 MSGP

27  Benchmark Values and Sources). Such pollutants include Polycyclic Aromatic Hydrocarbons (PAHs),

28

Complaint for Declaratory and Injunctive Relief          18
and Civil Penalties

Chemical Oxygen Demand (COD), Total Suspended Solids (TSS), pH, aluminum, lead, and zinc. *See, e.g.*, 2021 Permit, Permit Part 8, Subparts C and Q.

2.   *Receiving Water Limitations*

80.    Section 303 of the Act, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. The Act prohibits discharges from causing or contributing to a violation of such state Water Quality Standards.  *See* 33 U.S.C. § 1311(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. § 122.44(d)(1).

81.    The State of California regulates water quality through the State Board and nine Regional Boards, and each Regional Board maintains a separate Water Quality Control Plan, which contains Water Quality Standards for water bodies within its geographic area.

82.    The San Francisco Bay Regional Water Quality Control Board has adopted the "San Francisco Bay Basin (Region 2) Water Quality Control Plan" ("Basin Plan"), as amended by Resolution No. R2-2010-0100, which sets forth the Water Quality Standards and beneficial uses for San Francisco Bay and its tributaries. The Basin Plan is the "master water quality control planning document. It designates beneficial uses and water quality objectives for waters of the State, including surface waters and groundwater" as well as "programs of implementation to achieve water quality objectives." *See* https://www.waterboards.ca.gov/sanfranciscobay/basin_planning.html.

83.    The Basin Plan lists water quality objectives that apply to "all surface waters within the region, except the Pacific Ocean." Basin Plan at 3-3. Among those objectives, the Basin Plan lists objectives for bacteria, sets narrative standards for bioaccumulation and biostimulatory substances, states that "waters shall be free of coloration that causes nuisance or adversely affects beneficial uses," and sets targets for dissolved oxygen, pH, radioactivity, salinity, sediment, temperature, toxicity, turbidity, and un-ionized ammonia. Basin Plan at 3-3 to 3-8 (pdf p. 76-81).

84.    The Basin Plan also provides the following water quality objectives:

a.    Floating Material – "Waters shall not contain floating material, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses." Basin Plan § 3.3.6.

b.      Oil and Grease – "Waters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses." Basin Plan § 3.3.7.

c.      Population and Community Ecology – "All waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce significant alterations in population or community ecology or receiving water biota. In addition, the health and life history characteristics of aquatic organisms in waters affected by controllable water quality factors shall not differ significantly from those for the same waters in areas unaffected by controllable water quality factors." Basin Plan § 3.3.8.

d.      Settleable Material – "Waters shall not contain substances in concentrations that result in the deposition of material that cause nuisance or adversely affect beneficial uses." Basin Plan § 3.3.13.

e.      Suspended Material – "Waters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses." Basin Plan § 3.3.14.

f.      Sulfide – "All water shall be free from dissolved sulfide concentrations above natural background levels. Sulfide occurs in Bay muds as a result of bacterial action on organic matter in an anaerobic environment. Concentrations of only a few hundredths of a milligram per liter can cause a noticeable odor or be toxic to aquatic life. Violation of the sulfide objective will reflect violation of dissolved oxygen objectives as sulfides cannot exist to a significant degree in an oxygenated environment." Basin Plan § 3.3.15.

g.      Tastes and Odors – "Waters shall not contain taste- or odor-producing substances in concentrations that impart undesirable tastes or odors to fish flesh or other edible products of aquatic origin, that cause nuisance, or that adversely affect beneficial uses." Basin Plan § 3.3.16.

85.      The Basin Plan also defines beneficial uses. In the Basin Plan, the Carquinez Strait has beneficial uses for: (a) industrial service supply (IND); (b) navigation (NAV); (c) commercial and sport fishing (COMM); (d) water contact recreation (REC1); (e) non-contact water recreation (REC2); (f) estuarine habitat (EST); (g) wildlife habitat (WILD); (h) rare, threatened, or endangered species

(RARE); (i) migration of aquatic organisms (MIGR); and (j) spawning, reproduction and development (SPWN). *See* Basin Plan at Table 2-1.

86.     Non-contact use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible.  These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tide pool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities.  Water quality considerations relevant to non-contact water recreation, such as hiking, camping, or boating, and those activities related to tide pool or other nature studies require protection of habitats and aesthetic features." Basin Plan at 2.1.16. Visible pollution impairs people's use of the Carquinez Strait water contact recreation and noncontact water recreation.

87.     The General Permit also includes additional Receiving Water Limitations that prohibit storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. *See* 2015 Permit, Sections III.C., VI.C. The Receiving Water Limitations also prohibit storm water discharges to surface or groundwater that adversely impact human health or the environment. *See* 2015 Permit, Section VI.B.

88.     The Carquinez Strait is also an impaired water under section 303(d), 33 U.S.C. § 1313(d), for Mercury. Mercury is a component of petcoke and is included in discharges from the Port, both of polluted storm water and directly from loading.

89.     Storm Water Discharges from industrial facilities like Defendants' which cause or contribute to exceedances of Receiving Water Limitations in the General Permit and applicable water quality objectives must comply with the General Permit, or they violate the Clean Water Act.

### 3.   *The Storm Water Pollution Prevention Plan*

90.     The General Permit requires the preparation and implementation of a Storm Water Pollution Prevention Plan ("SWPPP") prior to conducting, and in order to lawfully continue, industrial activities. General Permit, § X. To comply with the General Permit, dischargers must have developed and implemented a SWPPP by July 15, 2015, including the description of BMPs that comply with the BAT/BCT standard. *See* General Permit, §§ X.B-C.

Complaint for Declaratory and Injunctive Relief             21
and Civil Penalties

91.     The objectives of the SWPPP include the identification and evaluation of sources of pollutants associated with industrial activities that may affect the quality of storm water and non-storm water discharges, and to implement site-specific BMPs to reduce or prevent pollutant concentrations in discharges to levels that comply with the General Permit's technology-based Effluent Limitations and Receiving Water Limitations. *See* General Permit, § X.C.

92.     The SWPPP must include, among other things: a narrative description and assessment of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of the BMPs developed and implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges necessary to comply with the General Permit; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and the identification of individuals and their current responsibilities for developing and implementing the SWPPP. *See* General Permit, §§ X.A-H.

93.     One important element of any SWPPP is the description of each industrial process occurring at a facility, and the assessment of potential pollutant sources ("Source Evaluation and Pollutant Assessment"). *See* General Permit, §§ X.C, X.F, X.G.

94.     Each of the industrial processes and all industrial activities undertaken at the Facility are pollutant sources that must be described and assessed for their potential contribution of pollutants in storm water discharges in the SWPPP's Source Evaluation and Pollutant Assessment.

95.     The SWPPP must be evaluated and revised at least annually to ensure ongoing compliance. General Permit, § X.B. Any failure to develop, implement, or revise a comprehensive SWPPP that contains all required elements is a violation of the General Permit, and creates liability under the Act. General Permit, § X.B; *see also* General Permit, Fact Sheet § II.I.1.

4.    *The Monitoring Implementation Plan*

96.     Permittees must develop and implement a storm water monitoring and reporting

program—called a Monitoring Implementation Plan ("MIP")—prior to conducting, and in order to lawfully continue, industrial activities. *See* General Permit, §§ X.I, XI.A-D. The MIP must be included in the SWPPP. *See* General Permit, X.A.8. The objective of the MIP is to detect and measure concentrations of pollutants in a facility's storm water discharges, and to ensure compliance with the General Permit's Effluent Limitations and Receiving Water Limitations. *See* General Permit, Factsheet § II.J.1. A lawful MIP ensures that BMPs are effectively reducing and/or eliminating pollutants in a facility's storm water discharges, and is evaluated and revised whenever appropriate to ensure ongoing compliance with the General Permit. *Id*.

97.     Facility operators must complete storm water sampling and analysis. General Permit, § XI.B. The General Permit requires the collection and analysis of two storm water samples from a Qualifying Storm Event ("QSE") between July 1 and December 31 of each reporting year, and two samples from a QSE between January 1 and June 30 of each reporting year. Each sample must be collected within four hours of the start of a discharge, or the start of facility operations if the QSE occurs within the previous 12-hour period. General Permit, § XI.B.5.

98.     Permittees must also conduct visual observations at least once a month, and at the same time sampling occurs at each discharge location. General Permit, § XI.A. Observations must document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, or odor, and identify the source of any pollutants. General Permit, § XI.A.2. Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants observed in storm water discharges. General Permit, § XI.A.3.

99.     The General Permit requires permittees to analyze samples for, among other parameters, total suspended solids and oil and grease (§ XI.B.6.a); pH (§ XI.B.6.b); additional site-specific parameters identified during the pollutant source assessment (§ XI.B.6.c); parameters based on the facility's Standard Industrial Classification ("SIC") Code (§ XI.B.6.d; Table 1); and additional applicable industrial parameters related to receiving waters with 303(d) listed impairments, or approved Total Maximum Daily Loads (§ XI.B.6.e). Permittees must submit all sampling and analytical results for all samples via the State Board's Stormwater Multiple Application and Report Tracking System ("SMARTS") database within 30 days of obtaining the results for each sampling event. General Permit §

XI.B.11.a.

100.    Permittees that fail to develop and implement an adequate MIP that includes both visual observations and sampling and analysis are in violation of the General Permit, and consequently the Clean Water Act. General Permit, § II.J.3.

<u>5.    *The Annual Comprehensive Facility Compliance Evaluation*</u>

101.    Permittees must complete an Annual Comprehensive Facility Compliance Evaluation each reporting year. General Permit, § XV. The goal of the Compliance Evaluation is to ensure and certify compliance with each of the General Permit's other mandates.

102.    The Compliance Evaluation must include, at a minimum: (i) a review of all sampling, visual observation, and inspection records conducted during the previous year; (ii) an inspection of all areas of industrial activity and associated pollutant sources for evidence of pollutants entering the storm water conveyance system; (iii) an inspection of all drainage areas previously identified as having no exposure to industrial activities; (iv) an inspection of equipment needed to implement BMPs; (v) an inspection of BMPs; (vi) a review and effectiveness assessment of all BMPs to determine if the BMPs are properly designed, implemented, and are adequately reducing/preventing pollutants in storm water discharges; and (vii) an assessment of any other factors needed to comply with the requirements of Section XVI.B (i.e. Annual Report mandates). General Permit, § XV.

**V.    FACTUAL ALLEGATIONS**

**A.    The Facility**

103.    Amports runs the Port of Benicia Terminal. Amports' operations at the Facility consist of a vehicle loading and offloading Facility, including parking, as well as the receipt, storage, and eventual loading onto ships of petcoke, where it is generally transported to Asia for use in fuel power plants.

104.    Near the terminal, there is a public access point to the Bay, a fishing pier, a public boat marina, and a port, a wide variety of bird and fish species, and other potential recreational or environmental uses that may be impacted by Amports' pollution.

105.    The Valero Benicia Refinery processes domestic crude from the San Joaquin Valley in California and the Alaska North Slope, along with foreign sour crudes. The refinery processes crude oil by separating it into a range of hydrocarbon components or fractions. Petroleum fractions include heavy

oils and residual materials used to make asphalt or petroleum coke, mid-range materials such as diesel (heating oil), jet fuel and gasoline, and lighter products, such as butane, propane, and fuel gases.

106.     The petroleum coke from Valero's refinery is transported via railcar to silos at the Amports Facility where it is stored. Amports then transfers the petcoke from the silos to a ship's hold by way of a conveyor belt. Amports is permitted by the Bay Area Air Quality Management District (BAAQMD) to process or deliver 2 million tons of petcoke to ships in any 12-month period. Upon information and belief, between twelve and eighteen ships are loaded with petcoke by Amports in any given year.

**B.      The Petcoke Operation at the Facility Causes Direct Discharges of Pollutants into the Carquinez Strait**

107.     When Amports loads a ship with petcoke it causes discharges of petcoke directly into the Carquinez Strait. Depending on the size of the ship, the number of active work shifts, and the rate at which petcoke is sprayed from the conveyor system, it takes Amports several days and several separate work shifts to load a ship. Amports loads as many as eighteen ships in a given year.

108.     First, petcoke spills off of the conveyor belt system directly onto the wharf and directly into the Carquinez Strait. This occurs while the conveyor crane boom is in the lowered position, and, as depicted below, continues as the boom is raised while the conveyor continues to operate.

109.     Second, petcoke is deposited onto the deck of the ship and into the water, potentially due to overspray from the loading mechanism or other operations, leaving visible plumes of petcoke that can be seen in the water.

110.     Third, at the conclusion of the loading, longshoremen hose off the deck of the ship, and the related loading equipment on and around the ship, cleaning the equipment and forcing contaminated runoff directly into the Carquinez Strait, again leaving visible plumes of petcoke that can be seen in the water.

111.     Fourth, as the ship is being loaded, large visible clouds of black particulate matter, presumably petcoke dust, drift through the air away from the ship before being directly deposited into the water and/or onto the nearby shoreline.

112.     The below photos were obtained by Baykeeper through use of its drone showing petcoke overspray, escape of particulate matter during petcoke loading, and petcoke in the water.



March 2021.                                          February 2021.



February 2021.

113.     <u>Fifth</u>, depending on operational variables during loading (e.g., the product pore velocity of the petcoke loading operations, BMP implementation), petcoke that has been loaded into the ship hull is remobilized as aerial emissions that reenter the immediately surrounding atmosphere and then discharges into the Carquinez Strait, and onto the ship, wharf, and Facility.

114.     The discharged petcoke contains pollutants such as copper, zinc, nickel, arsenic, mercury,

and heavy metals which are harmful to aquatic life. The deposition of petcoke into San Francisco Bay is harmful and deleterious to the Bay.

115.   The petcoke is discharged through a discrete conveyance system. The discharge nozzle which sprays petcoke into the ship (and which results in overspray into nearby waters), the conveyor which moves the petcoke from silos to the loading crane, and the hosing off of the equipment and decks into the water all constitute discrete conveyances and therefore are point sources.

116.   The Carquinez Strait is a water of the United States and a water of the state of California.

117.   Amports does not have an NPDES permit authorizing its point source discharges of pollutants into the waters of the United States.

118.   Amports' conduct is ongoing. Amports continues to load ships with petcoke despite receiving Baykeeper's Notice Letter. Upon information and belief, Amports is attempting to conceal its conduct by operating in part at night to prevent anyone from seeing the particulate matter pollution it generates and deposits into the water.

119.   Upon information and belief, Amports continues to receive petcoke from Valero and will continue to do so, necessitating storage, loading, and pollution at the Facility and in the Carquinez Strait.

120.   Absent injunctive relief requiring Amports to cease its unpermitted discharges, it will continue to discharge.

121.   The direct discharges of pollutants into the Carquinez Strait causes or contributes to impairment of water quality in the receiving waters.

C.   **Defendants Discharge Petcoke Laden Stormwater Associated with Industrial Activities**

122.   In addition to the direct discharges identified above, including direct discharges onto the wharf and ship, petcoke escapes and can be deposited onto the Facility or into the water during: (a) the offloading from train cars, (b) the movement of petcoke around the Facility, (c) storage at the Facility, (d) from equipment and vehicle cleaning, and (e) from equipment and vehicle maintenance or repair.

123.   Once the petcoke is deposited on ships, docks, premises, and other nearby areas, it is mobilized and washed into the water during storm events with more than 0.1 inches of rain at the Port. For each qualifying storm event since October 2016, Defendants have illegally discharged polluted

storm water into waters of the United States. As a result, each time a sufficient rain event occurs,

Defendants discharge pollutants from industrial activity in storm water.

124.    The petcoke pollution commingles with pollution from other industrial activities at the

Facility, all of which is discharged either into storm water systems or via sheet flow and eventually

reaches the Carquinez Strait.

125.    Amports also has registered its storage of petcoke with the California Environmental

Protection Agency ("CalEPA"). Under CalEPA's regulated site portal,

https://siteportal.calepa.ca.gov/nsite/map/help/detail/5653/profile, Amports' Facility is registered as a

Chemical Storage Facility, operating under Standard Industrial Classification ("SIC") code 4491

(Marine Cargo Handling). It also lists the hazardous material stored at the site as "tons" of petcoke,

along with smaller amounts of used lubricating oil, surfactant blend, petroleum lubricating oil, and

"Rando 15." *Id.* at "Chemicals" tab (reproduced below).



126.    Amports' operations at the Port are industrial activity under the Clean Water Act.

Amports' industrial operations, activities, and locations at the Facility include, but are not limited to:

vehicle and equipment maintenance; vehicle and equipment cleaning; bulk material storage; material

storage and disposal areas; vehicle and equipment storage areas; shipping and receiving areas; loading

and unloading areas; driveway areas; maintenance areas; and the on-site material handling equipment

such as conveyors, forklifts, cranes, trucks, and vessels. The Facility also stores materials associated

with vehicle maintenance and equipment cleaning operations at the Facility.

127.    The petcoke loading operation is a separate economic activity from the vehicle import, export, and parking operation. Petcoke dust and pollutants associated with the petcoke operation at the Facility spread throughout the site, including onto the vehicles that are loaded, unloaded, and stored. The rail system associated with the petcoke operation also causes petcoke dust to be distributed on the tracks and throughout the site.

128.    Other facilities in the Bay Area that similarly store, load, or unload petcoke from railcars, trucks, and ships, include the Levin Richmond Terminal Corp. facility in Richmond and the Koch Carbon facility in Pittsburgh. Both of these facilities have classified themselves as industrial facilities under the Clean Water Act and General Permit, using SIC Code 4491 – Marine Cargo Handling.

129.    Prior to 2017, when describing its activities at the Facility to the San Francisco Bay Regional Water Quality Control Board, Amports also classified its operations using SIC Code 4491 for Marine Cargo Handling. This classification triggers compliance with the General Permit in California for storm water discharges associated with industrial activity. In 2017, Amports filed a "Notice of Termination" of its coverage under the General Permit. In the Notice of Termination, Amports stated to the State Board that, "Amports no longer performs marine cargo handling as our current SIC code suggests. A better description of our activities would include 7521 Automobile Parking, 4731 Arrangement of Transportation of Freight and Cargo and 7538 General Automotive Repair. It is our understanding these codes do not require IGP [Industrial General Permit] coverage." Notice of Termination filed Dec., 2017.

130.    This characterization of Amports' activities was and remains incorrect due to Amports' industrial activities at the Facility related to its handling of marine cargo, including automobiles and petcoke. Because Amports is discharging storm water related to industrial activity, it is required to comply with the General Permit. Its decision to terminate coverage makes its ongoing storm water pollution illegal.

131.    The discharge of pollutants from industrial facilities contributes to the impairment of surface waters and aquatic-dependent wildlife. These contaminated discharges can and must be controlled for ecosystems to regain their health and to protect public health.

132.    A list of storm events generating more than 0.1" of rain at the Facility for the five years

leading to October 2021 was included with Baykeeper's Notice Letter, and is incorporated herein. *See* Exhibit A at p. 19 of 20.

133. The discharge of polluted storm water from the Facility causes or contributes to the impairment of receiving waters.

**D.  Amports Does Not Have any Valid NPDES Permit for its Direct and Indirect Discharges, is not Covered by the General Permit, and Does not Comply with the General Permit's Requirements**

134. Amports does not currently have an NPDES permit authorizing discharges of petcoke into the Carquinez Strait.

135. Amports' 2015 Notice of Intent to Comply with the General Permit was Terminated by Amports in 2017. Since its termination, Amports has not filed a Notice of Intent to comply with the General Permit for its industrial storm water discharges.

136. Amports does not use BAT/BCT practices at the Facility to avoid or mitigate storm water discharges.

137. Amports does not have a valid SWPPP, nor does it have any of the components of a SWPPP that are necessary to comply with the General Permit.

138. Amports does not engage in reporting or monitoring of industrial storm water discharges as required by the General Permit.

139. Amports does not conduct comprehensive evaluations related to industrial storm water discharges from the Facility as required by the General Permit.

140. Amports' Clean Air Act permits issued by BAAQMD do not relieve it of the responsibility for complying with the Clean Water Act.

**E.  Valero's NPDES Permit for its Refinery Operations Does Not Allow the Discharge of Petcoke into the Water**

141. For more than fifteen years, Valero has had an individual NPDES Permit associated with its operation of the Valero Refinery. *See* NPDES CA0005550; *see also* Order R2-2020-0033 (adopting permit , effective January 1, 2021) and Order No. R2-2015-0037 (adopting permit, effective October 1, 2015) (the "Refinery NPDES Permit"). Valero's Refinery NPDES Permit does not cover the direct

discharge of petcoke into the Carquinez Strait that occurs during petcoke loading. Valero's Refinery NPDES Permit also does not cover storm water discharges originating from either the petcoke loading operation or the commingled storm water discharges containing petcoke pollution that occur from throughout the Facility. The storm water discharges occur throughout both the portion of the Facility leased by Amports, as well as the areas subleased from Amports to Valero. Valero's Refinery NPDES Permit does not allow for discharges of petcoke in storm water from the storage silos, loading operation, or on ship conduct or discharges, nor does it allow direct discharges of petcoke into the Carquinez Strait.

142.    The area of storm water collection and discharge covered by Valero's Refinery NPDES Permit does not include the (1) automobile parking, (2) automobile washing and maintenance, (3) automobile offloading, or (4) any commingled petcoke discharge that results from the storage and loading of petcoke at the Port.

143.    As part of Valero's SWPPP in connection with its Refinery NPDES Permit, Valero included limited management practices that were putatively intended to prevent petcoke from distributing throughout the Facility, entering the storm water, and entering the Carquinez Strait Directly. The existing management practices are not adequate BMPs to either prevent discharges or comply with the Clean Water Act.

144.    Upon information and belief, the management practices described in the SWPPP (1) are not being implemented and/or (2) are being implemented improperly. As a result, the current and ongoing practices at the Facility allow for unauthorized discharges of petcoke into waters of the United States.

VI.    <u>CLAIMS FOR RELIEF</u>

**FIRST CAUSE OF ACTION**

**Discharges of Pollutants to Waters of the United States without NPDES Permit Coverage in**

**Violation of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1365(a), and 1365(f)**

145.    Baykeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

146.    Defendants discharged and continue to discharge pollutants from the Port of Benicia Terminal into waters of the United States without NPDES Permit coverage, in violation of Clean Water

1  Act section 301(a), 33 U.S.C. § 1311(a). When Defendants load a ship with petcoke, pollutants and
2  petcoke dust are discharged from a point source into waters of the United States without a permit.

3          147.    Defendants' violations of Clean Water Act section 301(a), 33 U.S.C. § 1311(a) are
4  ongoing.

5          148.    Defendants will continue to be in violation of the Clean Water Act each and every time
6  pollutants are discharged directly into waters of the United States in violation of section 301(a) of the
7  Act during ship loading. Each discharge is a separate and distinct violation of the Act.

8          149.    By committing the acts and omissions alleged above, Defendants are subject to an
9  assessment of civil penalties for each and every violation of the Clean Water Act occurring after October
10  2016 of up to $56,460 per day.

11          150.    An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. §
12  1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm
13  Baykeeper and the citizens of the State of California, for which harm Baykeeper has no plain, speedy, or
14  adequate remedy at law.

15          WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

16                              **SECOND CAUSE OF ACTION**
17                        **Failure to Apply for NPDES Permit Coverage**
18          **(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

19          151.    Baykeeper incorporates the allegations contained in the above paragraphs as though fully
20  set forth herein.

21          152.    CWA Section 402(p)(4)(A), 33 U.S.C. § 1342(p)(4)(A) and the implementing regulation
22  found at 40 C.F.R. § 122.26(a)(1)(i), (c)(1), and (e)(1), require facilities discharging stormwater
23  associated with industrial activity to obtain a NPDES permit.

24          153.    40 C.F.R. § 122.26(e)(1) and 122.26(e)(1) require dischargers of stormwater associated
25  with industrial activity to apply for an individual permit or seek coverage under a promulgated
26  stormwater general permit by October 1, 1992.

27          154.    For at least the last five years, Defendants have operated and continue to operate a facility
28  that engages in "industrial activity" as that term is defined in 40 C.F.R. § 122.26(b)(14).

155.   During that time, Defendants have routinely discharged polluted stormwater and process wastewater associated with industrial activity from the Facilities to waters of the United States.

156.   Therefore, since that time, Defendants have been obligated to apply for coverage under an individual or general NPDES permit.

157.   As set forth above, Valero's Refinery NPDES Permit does not cover storm water discharges originating from either the petcoke loading operation or the commingled storm water discharges containing petcoke pollution that occur from throughout the Facility.

158.   Once Defendants began discharging polluted stormwater associated with industrial activity to waters of the United States, each and every subsequent day on which Defendants failed to apply for permit coverage constitutes a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

### THIRD CAUSE OF ACTION
### Failure to Comply with the Terms of an NPDES Permit
### (Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)

159.   Baykeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

160.   When Defendants load a ship with petcoke, pollutants and petcoke dust are discharged from a point source into waters of the United States in violation of Valero's Refinery NPDES permit.

161.   The pollutants that cause or threaten to cause pollution, contamination, or nuisance, in violation of Valero's Refinery NPDES Permit, discharge during and/or after every significant rain event or any other storm water discharge from the Facility in the last five years.

162.   Examples of such violations include:

a.   The discharge of wash water or other process wastewater to the Carquinez Straight in violation of the Refinery NPDES Permit's prohibition of "[t]he bypass of untreated or partially-treated wastewater to waters of the United States is prohibited, except as provided for in the conditions stated in Attachment D section I.G." (Refinery NPDES Permit at III.C; 2015 Order at p. 7; 2020 Order at p. 6);

Complaint for Declaratory and Injunctive Relief    33
and Civil Penalties

1    b.    The failure to implement reasonable BMPs in violation of the Refinery NPDES

2  Permit's requirement that "[t]he Discharger shall take all reasonable steps to minimize or prevent any

3  discharge or sludge use or disposal in violation of this Order that has a reasonable likelihood of

4  adversely affecting human health or the environment. (40 C.F.R. § 122.41(d).)" (Refinery NPDES

5  Permit, Attachment D, at I.C; 2015 Order at D-1; 2020 Order at D-1); and,

6    c.    The violation of Receiving Water Limitations that include floating material,

7  alteration of suspended sediment, suspended material in concentrations that cause nuisance or adversely

8  affect beneficial uses, bottom deposits, temperature, turbidity, coloration, visible, floating, suspended, or

9  deposited oil or other products of petroleum origin, and toxic substances (Refinery NPDES at V.A; 2015

10  Order at 10, 2020 Order at 9-10); the discharge of pollutants that cause a violation of "water quality

11  standard[s] for receiving waters adopted by the Regional Water Board or the State Water Resources

12  Control Board (State Water Board) as required by the CWA and regulations adopted thereunder"

13  (Refinery NPDES Permit at V.C; 2015 Order at 11; 2020 Order at 10).

14    163.    Defendants' discharges of contaminated storm water and its violations of Valero's

15  Refinery NPDES Permit and the Clean Water Act are ongoing. Defendants will continue to be in

16  violation of the Refinery NPDES Permit and the Clean Water Act each and every time contaminated

17  storm water discharges from the Facility. Each discharge occurring without complying with the Refinery

18  NPDES Permit is a separate and distinct violation of section 301(a) of the Clean Water Act, 33 U.S.C. §

19  1311(a).

20    164.    Defendants are not in compliance with the Clean Water Act's disclosure requirements for

21  NPDES permit applications with regard to pollutants discharged in relation to Defendants' petcoke

22  loading operations.

23    165.    By committing the acts and omissions alleged above, Defendants are subject to an

24  assessment of civil penalties for each and every violation of the Clean Water Act occurring after October

25  2016 of up to $56,460 per day.

26    166.    An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. §

27  1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm

28  Baykeeper and the citizens of the State of California, for which harm Baykeeper has no plain, speedy, or

1   adequate remedy at law.

2   WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

3   **FOURTH CAUSE OF ACTION**

4   **Discharges of Storm Water from Industrial Activity to Waters of the United States without**

5   **Complying with the General Permit in Violation of the Clean Water Act, 33 U.S.C. §§ 1311(a),**

6   **1342, 1365(a), and 1365(f)**

7   167.   Baykeeper incorporates the allegations contained in the above paragraphs as though fully

8   set forth herein.

9   168.   Defendants discharged and continue to discharge storm water from the Port of Benicia

10   Terminal that contains pollutants associated with industrial activity.

11   169.   The pollutants that cause or threaten to cause pollution, contamination, or nuisance, in

12   violation of the General Permit, discharge during and/or after every significant rain event or any other

13   storm water discharge from the Facility in the last five years.

14   170.   Defendants' discharges of contaminated storm water and its violations of the General

15   Permit and the Clean Water Act are ongoing. Defendants will continue to be in violation of the General

16   Permit and the Clean Water Act each and every time contaminated storm water discharges from the

17   Facility absent compliance with the General Permit. Each discharge occurring without complying with

18   the General Permit is a separate and distinct violation of section 301(a) of the Clean Water Act, 33

19   U.S.C. § 1311(a).

20   171.   By committing the acts and omissions alleged above, Defendants are subject to an

21   assessment of civil penalties for each and every violation of the Clean Water Act occurring after October

22   2016 of up to $56,460 per day.

23   172.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. §

24   1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm

25   Baykeeper and the citizens of the State of California, for which harm Baykeeper has no plain, speedy, or

26   adequate remedy at law.

27   WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

28

**FIFTH CAUSE OF ACTION**

**Discharges of Contaminated Storm Water to Waters of the United States without Complying with Technology Based Effluent Limitations in Violation of the General Permit and the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

173.    Baykeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

174.    Baykeeper is informed and believes, and thereon alleges, that Defendants failed and continue to fail to implement BAT/BCT at the Facility.

175.    Upon information and belief, the storm water discharged from the Facility contains pollutants above effluent limitations. Defendants failed and continue to fail to implement BAT/BCT at the Facility in violation of the General Permit.

176.    Defendants will continue to be in violation of the General Permit and the Clean Water Act each and every time contaminated storm water discharges from the Facility in the absence of proper BAT/BCT practices as required by the General Permit. Each discharge is a separate and distinct violation of section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

177.    Defendants have been in violation of the BAT/BCT requirements in the General Permit each day from October 2016 to present.

178.    By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act occurring after October 2016 of up to $56,460 per day.

179.    An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Baykeeper and the citizens of the State of California, for which harm Baykeeper has no plain, speedy, or adequate remedy at law.

///

///

///

///

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

**SIXTH CAUSE OF ACTION**

**Discharges of Contaminated Storm Water in Violation of the General Permit's Receiving Water Limitations and the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

180.    Baykeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

181.    Upon information and belief, Defendants have discharged and continue to discharge storm water from the Facility containing levels of pollutants that adversely impact human health and/or the environment in violation of Receiving Water Limitation (C)(1) of the General Permit during and/or after every significant rain event or any other storm water discharge from the Facility. These violations are ongoing.

182.    Upon information and belief Defendants have discharged and continue to discharge storm water from the Facility containing levels of pollutants that cause or contribute to exceedances of water quality standards in violation of Receiving Water Limitation (C)(2) of the General Permit, during and/or after every significant rain event or other storm water discharge from the Facility. These violations are ongoing.

183.    Defendants will continue to be in violation of the General Permit and the Clean Water Act each and every time storm water containing pollutants at levels that violate Receiving Water Limitation (C)(1) of the General Permit discharges from the Facility.

184.    Defendants will continue to be in violation of the General Permit and the Clean Water Act each and every time storm water containing pollutants at levels in violation of Receiving Water Limitation (C)(2) of the General Permit discharges from the Facility.

185.    Each and every violation of Receiving Water Limitation (C)(1) of the General Permit is a separate and distinct violation of section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

186.    Each and every violation of Receiving Water Limitation (C)(2) of the General Permit is a separate and distinct violation of section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

187.    By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act occurring after October

Complaint for Declaratory and Injunctive Relief                    37
and Civil Penalties

1  2016 of up to $56,460 per day.

2      188.    An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. §

3  1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm

4  Baykeeper and the citizens of the State of California, for which harm Baykeeper has no plain, speedy, or

5  adequate remedy at law.

6      WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

7                           **SEVENTH CAUSE OF ACTION**

8  **Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention**

9  **Plan in Violation of the General Permit and Clean Water Act, 33 U.S.C. §§ 1311(a), 1342, 1365(a),**

10                                 **and 1365(f)**

11     189.    Baykeeper incorporates the allegations contained in the above paragraphs as though fully

12  set forth herein.

13     190.    Defendants have failed and continue to fail to adequately develop, implement, or revise a

14  proper and appropriate SWPPP for the Facility in violation of the General Permit. This failure includes

15  the lack of BMPs for the Facility to reduce pollutants in storm water discharges.

16     191.    Defendants' violation of the General Permit based on Defendants' lack of a SWPPP

17  constitutes a violation of the General Permit for every day from October 2016 to the present.

18  Defendants' violation is ongoing, and Defendants will continue to violate the Clean Water Act for each

19  day they do not develop, implement, and revise a qualifying SWPPP.

20     192.    The SWPPP that is part of Valero's Refinery NPDES Permit does not relieve Amports of

21  its obligations under the Clean Water Act, does not cover all of the industrial activity area at the Facility,

22  and does not constitute a properly developed or implemented SWPPP.

23     193.    Each and every violation of the General Permit's SWPPP requirements at the Facility is a

24  separate and distinct violation of the Clean Water Act.

25     194.    By committing the acts and omissions alleged above, Defendants are subject to an

26  assessment of civil penalties for each and every violation of the Clean Water Act occurring after October

27  2016 of up to $56,460 per day.

28     195.    An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. §

Complaint for Declaratory and Injunctive Relief        38
and Civil Penalties

1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Baykeeper and the citizens of the State of California, for which harm Baykeeper has no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiff prays for judgment against the Defendants as set forth hereafter.

### EIGHTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and/or Revise a Monitoring Implementation Program in Violation of the General Permit and the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

196.   Baykeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

197.   Defendants have failed and continue to fail to adequately develop, implement, or revise a qualifying and adequate Monitoring Implementation Program for the Facility in violation of the General Permit and Clean Water Act.

198.   Defendants' violation of the General Permit based on their lack of a qualifying and adequate Monitoring Implementation Program constitutes a violation of the General Permit for every day from October 2016 to the present. Defendants' violation is ongoing, and Defendants will continue to violate the Clean Water Act for each day they do not develop, implement, and revise a qualifying Monitoring and Reporting Program.

199.   The Monitoring Implementation Program contained in Valero's Refinery NPDES Permit does not relieve Amports of its obligations under the Clean Water Act, does not cover all of the industrial activity area at the Facility, and does not constitute a properly developed or implemented Monitoring Implementation Program.

200.   Each and every violation of the General Permit's Monitoring Implementation Program requirements at the Facility is a separate and distinct violation of the Clean Water Act.

201.   By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act occurring after October 2016 of up to $56,460 per day.

202.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. §

1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Baykeeper and the citizens of the State of California, for which harm Baykeeper has no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiff prays judgment against the Defendants as set forth hereafter.

## NINTH CAUSE OF ACTION

**Failure to Complete Annual Compliance Evaluations as Required by the General Permit in Violation of the General Permit and the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

203.    Baykeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

204.    Baykeeper is informed and believes, and thereon alleges, that Defendants have failed to conduct or submit complete Annual Comprehensive Facility Compliance Evaluations to the Regional Board in violation of the General Permit.

205.    Defendants have been in violation of the reporting requirements of the General Permit each day the Facility has operated without reporting. Defendants' violations of the Reporting Requirements of the General Permit and the Clean Water Act are ongoing.

206.    Defendants have been in daily and continuous violation every day since at least October 2016.

207.    By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act occurring after October 2016 of up to $56,460 per day.

208.    An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Baykeeper and the citizens of the State of California, for which harm Baykeeper has no plain, speedy, or adequate remedy at law.

///

///

///

Complaint for Declaratory and Injunctive Relief                    40
and Civil Penalties

WHEREFORE, Plaintiff prays judgment against the Defendants as set forth hereafter.

## TENTH CAUSE OF ACTION

### Violation of Unfair Competition Law, Cal. Bus. & Prof. Code § 17200

209.    Baykeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

210.    When petcoke is loaded onto a ship at the Facility, petcoke is deposited into the Carquinez Strait.

211.    Defendants' method of transporting petcoke around and at the Facility, and then onto ships, places petcoke in locations where it can pass into the Carquinez Strait.

212.    Defendants permit petcoke to pass into waters of the Carquinez Strait during loading and via storm water discharges from the Facility.

213.    Depositing, allowing to pass into, or placing in a way that permits passage of petroleum or its residuary products like petcoke into waters of the state is illegal and unlawful in California under Fish and Game Code section 5650(a)(1).

214.    Petcoke is a residuary product of petroleum. The petcoke loaded at the Port that illegally enters the Carquinez Strait comes from the Valero Refinery's petroleum processing operations.

215.    The Carquinez Strait is a water of the State of California in addition to being a water of the United States.

216.    Defendants' violations of Fish and Game Code section 5650, the General Permit, Valero's Refinery NPDES Permit, and the Clean Water Act each constitute unlawful conduct under section 17200.

217.    Each Defendant is a person. *See* Bus. & Prof. Code § 17201.

218.    Baykeeper and its members have been and will continue to suffer injury and harm as a result of Defendants' unlawful conduct. Baykeeper has suffered injury in fact and monetary harm because it has dedicated resources to investigating and stopping Defendants' conduct that would not have been necessary but for Defendants' illegal actions and which could have been used on other matters.

219.    Defendants' ongoing pollution of petcoke into the Carquinez Strait frustrates Baykeeper's

mission.

220.    This Court has jurisdiction to enjoin Defendants' unlawful conduct that violates Fish and Game Code section 5650(a)(1) under Business and Professions Code section 17203.

WHEREFORE, Plaintiff prays judgment against the Defendants as set forth hereafter.

## VII.    PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court grant the following relief:

1. Judgment for Plaintiff in this matter enjoining Defendants' illegal conduct.

2. An order declaring

   i. Defendants to have violated and to be in violation of the Clean Water Act for their unpermitted discharges of petcoke into the Carquinez Strait;

   ii. Defendants to have violated and to be in violation of the Clean Water Act for their failure to obtain coverage under and comply with the General Permit;

   iii. Defendants to have violated and be in violation of the Clean Water Act for their failure to have BAT/BCT pollution controls in effect;

   iv. Defendants to have violated and be in violation of the Clean Water Act for their failure to develop, implement, or revise a valid SWPPP under the General Permit;

   v. Defendants to have violated and be in violation of the Clean Water Act for their failure to develop, implement, and revise a compliant Monitoring Implementation Program;

   vi. Defendants to have violated and be in violation of the Clean Water Act for their failure to conduct comprehensive annual compliance reviews of their Facility and storm water discharges; and

   vii. A Court order declaring Defendants have violated and continue to violate California Fish and Game Code section 5650(a)(1).

3. A Court order enjoining Defendants from violating the substantive and procedural requirements of the General Permit and Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342.

4. A Court order enjoining Defendants from continuing their violations of Fish and Game

1  Code section 5650 pursuant to Business and Professions Code section 17203.

2          5.   A Court order assessing civil monetary penalties for each violation of the Clean Water

3  Act in the amount of $56,460 per day per violation.

4          6.   A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness,

5  expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d),

6  and California Code of Civil Procedure section 1021.5.

7          7.   And any other relief as this Court may deem just and appropriate.

8

9  DATED:  March 1, 2022                    SAN FRANCISCO BAYKEEPER

10

11                                          By:      /s/ M. Benjamin Eisenberg

12                                                 M. BENJAMIN EISENBERG

13

14

15 DATED:  March 1, 2022                    SHUTE, MIHALY & WEINBERGER LLP

16

17                                          By:      /s/ Robert S. Perlmutter

18                                                 ROBERT S. PERLMUTTER

19                                          Attorneys for Plaintiff
                                            SAN FRANCISCO BAYKEEPER
20

21

22

23 1477941.1

24

25

26

27

28

Complaint for Declaratory and Injunctive Relief          43
and Civil Penalties