Eric J. Buescher (Bar No. 271323)
eric@baykeeper.org
M. Benjamin Eichenberg (Bar No. 270893)
ben@baykeeper.org
SAN FRANCISCO BAYKEEPER
1736 Franklin Street, Suite 800
Oakland, California 94612
Telephone: (510) 735-9700
Facsimile: (510) 735-9160

Robert S. Perlmutter (Bar No. 183333)
perlmutter@smwlaw.com
SHUTE, MIHALY & WEINBERGER LLP
396 Hayes Street
San Francisco, California 94102
Telephone: (415) 552-7272
Facsimile: (415) 552-5816

Attorneys for Plaintiff
SAN FRANCISCO BAYKEEPER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SAN FRANCISCO BAYKEEPER, a California non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>AMPORTS, INC., a Delaware Corporation; APS WEST COAST, INC., a Delaware Corporation; BENICIA PORT TERMINAL COMPANY, a Delaware Corporation; and VALERO REFINING COMPANY – CALIFORNIA, a Delaware Corporation,<br><br>Defendants. | Civil No. 3:22-cv-01294-WHO (LB)<br><br>[~~PROPOSED~~] CONSENT DECREE<br><br>(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*)<br><br>Honorable William H. Orrick |

[~~PROPOSED~~] CONSENT DECREE

3:22-cv-01294-WHO (LB)

1

## CONSENT DECREE

The following settlement agreement and Consent Decree ("Consent Decree") is entered into by and between Plaintiff San Francisco Baykeeper ("Plaintiff" or "Baykeeper"), and Defendants Amports, Inc.; APS West Coast, Inc.; Benicia Port Terminal Company (collectively, "Amports Defendants"); and Valero Refining Company – California ("Valero"). Valero and the Amports Defendants shall be collectively referred to as "Defendants". The entities entering this Consent Decree are each an individual "Settling Party" and collectively "Settling Parties."

## RECITALS

A. San Francisco Baykeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Oakland, California;

B. Baykeeper's mission is to defend the Bay and hold polluters accountable, in pursuit of which mission Baykeeper patrols on the water, investigates and stops polluters, and strengthens laws that protect the Bay for the benefit of its ecosystems and communities and on behalf of Baykeeper's approximately 3,500 members that live and/or recreate in and around the San Francisco Bay area;

C. Amports, Inc. is a holding company that owns APS West Coast, Inc. and Benicia Port Terminal;

D. APS West Coast, Inc. ("APS") owns, operates or has common control of approximately 407 acres of property in Benicia, California including, as relevant here, the Port of Benicia and property leased by Valero Marketing and Supply Co., an affiliate of Valero, from APS;

E. Benicia Port Terminal Company ("BPTC") is the terminal operator at the Port of Benicia;

F. Valero operates a crude oil petroleum refinery ("Refinery") in Benicia, California that produces fluidized petroleum coke (hereafter, "petcoke") as a co-product of its operations. The petcoke is conveyed by railcar from the Refinery to lower storage silos that are located on property adjacent to Carquinez Strait (the "Lower Silos Area"). The petcoke is conveyed from the silos by a system of conveyors to a loading tower located on a wharf that is owned by City of Benicia and leased to APS. Petcoke is transferred from the final conveyor to a loading arm that delivers the coke directly into the hold of the ship that is tied up at the wharf. Valero subleases the Lower Silos Area from APS, but owns the silos and the equipment used to convey petcoke from the silos into the ship. Valero also

[~~PROPOSED~~] CONSENT DECREE

1                                                              3:22-cv-01294-WHO (LB)

subleases a portion of the wharf that is occupied by the petcoke loading tower ("Wharf Area").  For purposes of this Consent Decree, (i) the "Lower Silos Area" is defined to mean the area subleased by Valero that encompasses the railcar unloading area, the coke silos, the conveyor that conveys petcoke from the silos onto the overhead conveyor, and the overhead conveyor that extends from the Lower Silos Area to the loading tower; and (ii) the "Wharf Area" is defined to mean the area of the wharf subleased by Valero that encompasses the loading tower and related infrastructure used to load coke into ships.  Together, the Lower Silos Area and the Wharf Area are referred to as the "Facility."

G.  The petcoke loading operation is conducted pursuant to a Work Agreement between Valero and APS, dated May 15, 2015, as extended thereafter from time to time ("APS/Valero Work Agreement" or "Work Agreement"), and in accordance with Standard Operating Procedures established by Valero (hereafter, "Valero SOPs").  Under the APS/Valero Work Agreement, APS employees operate the transfer equipment located in the Lower Silos Area and the Wharf Area, in accordance with the Valero SOPs.  APS and Valero are each responsible for implementation of certain actions, or arranging for certain actions to be implemented by third parties, as specified, in the Lower Silos Area, the Wharf Area and on the petcoke ship to ensure containment of petcoke during transfer and prompt cleanup in the event of a release of petcoke during the transfer process.

H.  The affirmative actions required to be taken by each Defendant pursuant to this Consent Decree shall be referred to as Best Management Practices ("BMPs").

I.  Shipments of petcoke occur approximately every three to four weeks, depending on production levels at the Refinery. Valero contracts with petcoke purchasers which, in turn, hire the ships that are used to transport the petcoke. Benicia Port Terminal Company, through its Tariff Agreement, also has the ability to establish conditions that must be met in order for any ship to dock at the Benicia Port;

J.  Stormwater discharges associated with industrial activity at the Facility are subject to regulation under the National Pollutant Discharge Elimination System General Permit No. CAS000001 applicable to Discharges of Storm Water Associated with Industrial Activities, Water Quality Order No. 2014-57-DWQ (hereinafter "Industrial Stormwater Permit" or sometimes "IGP" or "Industrial General Permit"), issued pursuant to Section 402 of the Federal Water Pollution Control

Act (the "Clean Water Act" or "Act"), 33 U.S.C. § 1342.  Industrial activities in the Lower Silos Area include unloading of petcoke from railcars, pneumatic transfer of petcoke into the silos, and conveyance of petcoke to the loading tower by overhead conveyor.  Industrial activities in the Wharf Area include the transfer of petcoke from the overhead conveyor to the loading arm, the loading of petcoke into the hold of the ship, and ancillary operations conducted on and around the loading tower.  Stormwater from each area discharges into the Carquinez Strait;

K.  On June 30, 2023, Valero filed a Notice of Intent and other Permit Registration Documents to obtain coverage under the Industrial General Permit for petcoke loading operations conducted at the Facility;

L.  Valero has prepared and is implementing a Storm Water Pollution Prevention Plan ("SWPPP") for the Facility, including Best Management Practices applicable to activities conducted in both the Lower Silos Area and the Wharf Area;

M.  The Industrial General Permit requires the discharger to comply *inter alia* with the following provisions with respect to petcoke handling and loading operations conducted at the Facility: (1) development and implementation of a SWPPP, including a Monitoring Implementation Plan, (2) control of pollutant discharges using, as appropriate, best available technology economically achievable (BAT) or best conventional pollutant control technology (BCT) to prevent or reduce pollutants in stormwater, (3) implementation of BAT and BCT through the development and application of Best Management Practices (BMPs), which must be included and updated in the SWPPP, and (4) when necessary, implementation of additional BMPs to prevent or reduce any pollutants that are causing or contributing to any exceedance of water quality standards.

N.  The petcoke rail unloader, lower petcoke silos and the system used to convey petcoke to, and load petcoke into, ships at the wharf are regulated pursuant to a Permit to Operate ("PTO") issued by the Bay Area Air Quality Management District (BAAQMD) (Site # A2329).  APS and Valero are listed as permittees under the PTO and are subject to all terms and conditions of the PTO. In addition, Permittees are required to comply with all applicable rules and regulations, including those applicable to control of particulate matter, prevention of public nuisances, and visible emissions and opacity, issued pursuant to BAAQMD's authority under Cal. Health and Safety Code §§ 40000 *et seq.* (air

pollution control districts generally) and 40200 *et seq.* (BAAQMD specifically);

O.  The Clean Water Act prohibits the discharge of pollutants into waters of the United States without a valid permit, in violation of permit limitations or as other proscribed by law;

P.  Depositing, allowing to pass into, or placing in a way that permits passage of petroleum or its residuary products (e.g., petcoke) into waters of the state is illegal and unlawful in California unless authorized pursuant to the terms of an order or permit issued by an authorized state agency(ies) (Fish and Game Code § 5650);

Q.  On or around October 4, 2021, and again on or around December 20, 2021, Baykeeper served Defendants, the Administrator of the U.S. Environmental Protection Agency (EPA), the Executive Director of the State Water Resources Control Board ("State Water Board"), the Executive Officer of the Regional Water Quality Control Board, San Francisco Bay Region ("Regional Water Board"), and the Regional Administrator of EPA Region IX, with a notice of intent to file suit ("60-Day Notice") under Section 505(b)(1)(a) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A), alleging violations of the Act and the Industrial Stormwater Permit at the Facility.

R.  On March 1, 2022, Baykeeper filed a complaint against Defendants in the United States District Court, Northern District of California, Civil Case No. 3:22-cv-01294-WHO;

S.  Baykeeper alleges Defendants are in violation of the substantive and procedural requirements of the Industrial Stormwater Permit and/or the Clean Water Act;

T.  Baykeeper alleges Defendants are in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 as a result of alleged violations of Fish and Game § 5650;

U.  Each Defendant denies all allegations and claims contained in the 60-Day Notice and the complaint and reserves all rights and defenses with respect to such allegations and claims.  Defendants, by entering into this settlement and Consent Decree, do not admit any fault, liability, or wrongdoing with respect to the facts, allegations, or claims alleged in the Action, nor shall this Consent Decree be construed as such.  Further, as among themselves, Defendants agree that the obligations and/or actions undertaken by each Defendant pursuant to this Consent Decree are undertaken solely for the purposes of resolving Baykeeper's complaint and shall not be relied on or offered as evidence in any proceeding or other context in which the terms or conditions or interpretation of the Work Agreement, the

[~~PROPOSED~~] CONSENT DECREE

1    requirements of any governmental permit or approval, or other legal obligation is at issue. Further,

2    nothing herein shall be construed to amend or interpret any existing contract(s) and/or agreement(s)

3    between Valero and the Amports Defendants, including but not limited to the Work Agreement and

4    the APS/Valero Sublease; and

5         V.  The Settling Parties believe it is in their mutual interest and choose to resolve in full

6    Baykeeper's allegations in the 60-Day Notice and complaint through settlement and avoid the cost

7    and uncertainties of litigation.

8

9         NOW  THEREFORE  IT  IS  HEREBY  STIPULATED  BETWEEN  THE  SETTLING

10   PARTIES, AND ORDERED BY AND DECREED BY THE COURT, AS FOLLOWS:

11                          **I.    OBJECTIVES**

12        1.    It is the express purpose of the Settling Parties to further the objectives set forth in the

13   Clean Water Act, 33 U.S.C. §§ 1251 et seq., and to resolve those issues alleged by Baykeeper in its

14   60-Day Notice and complaint. In light of these objectives and as set forth fully below, Defendants

15   agree to comply with the provisions of this Consent Decree, as applicable to each of them, and

16   corresponding provisions of the Clean Water Act and the California Fish and Game Code as applied

17   to petcoke operations at the Facility, including the Industrial Stormwater Permit related to the Facility.

18                     **II.    TERM OF CONSENT DECREE**

19        2.    **Effective Date**: The Effective Date of this Consent Decree shall be the date on which

20   the Court enters this Consent Decree. Such date shall be no earlier than the last day for the U.S.

21   Department of Justice ("DOJ") to provide comment on this Consent Decree pursuant to Section

22   505(c)(3) of the Clean Water Act (33 U.S.C. § 1365(c)(3)), i.e., the 45th day following DOJ's receipt

23   of the Consent Decree.

24        3.    **Term of Consent Decree**: This Consent Decree shall continue in effect until three (3)

25   years after the Effective Date (the "Term"), at which time the Consent Decree, and all obligations

26   under it, shall automatically terminate, unless one of the Settling Parties has invoked the dispute

27   resolution provisions of this Agreement in accordance with Paragraph 56 ("Dispute Resolution

28   Procedures") or the Parties mutually agree to extend the Consent Decree.

[~~PROPOSED~~] CONSENT DECREE

3:22-cv-01294-WHO (LB)

4.     **Early Termination of the Consent Decree**: If Valero permanently ceases petcoke loading operations at the Facility prior to the termination date of this Consent Decree set forth in the preceding paragraph, and files a Notice of Termination seeking to terminate its coverage under the General Permit for the Facility, Valero shall send Baykeeper a copy of the Notice of Termination concurrent with its submittal to the Regional Water Board. Within ten (10) days of the Regional Water Board's approval of the Notice of Termination, Valero shall notify Baykeeper in writing of the approval, after which Valero and APS, as applicable, shall each remit all outstanding payments, including stipulated payments, if any, to Baykeeper. Upon receipt of such payments, the Consent Decree shall be deemed terminated as to all Defendants.

5.     **Termination of Work Agreement**:  Should the APS/Valero Work Agreement be terminated, and APS ceases its participation in the operations of the Facility, APS shall notify Baykeeper within ten (10) days of the termination of such agreement.  Thereafter, the Amports Defendants shall remit all outstanding payments, including stipulated payments, if any, owed by the Amports Defendants to Baykeeper and the Consent Decree shall terminate as to the Amports Defendants only.

6.     **Transfer of Facility Operations to Third Party**: In the event Valero hires a third-party to assume APS's prior role in the operation of the Facility, Valero shall notify Baykeeper within ten (10) days of the transition and the identity of its new contractor. Valero shall in its contract with the new operator require the new operator to assume responsibility for implementation of APS' obligations under this Consent Decree pursuant to Paragraph 74.  Thereafter, the Amports Defendants shall remit all outstanding payments, including stipulated payments, if any, owed by the Amports Defendants to Baykeeper and the Consent Decree shall terminate as to the Amports Defendants only.

### III.     BEST MANAGEMENT PRACTICES – GENERAL

7.     **Reduction or Prevention of Discharges**.  In order to further reduce or prevent the discharge of fugitive petcoke either directly or via stormwater to the waters of the United States, Defendants shall comply with the provisions of this Consent Decree, as applicable to each Defendant, as necessary to comply with the requirements of the Clean Water Act, General Permit requirements, and California Fish and Game Code § 5650. All written instructions and documentation required under

[~~PROPOSED~~] CONSENT DECREE

this Consent Decree, including all observations and recordkeeping required under any applicable permit and regulatory requirements, shall be made available for inspection by Baykeeper at any site inspection or otherwise within five (5) business days of a written request by Baykeeper.  For purposes of this Consent Decree, a request sent via electronic mail shall be deemed to be in writing.

8.    **Diligent Implementation of BMPs.**  Each Defendant, as applicable, shall diligently file and pursue any required permit applications for structural BMPs called for under this Consent Decree, and shall diligently procure contractors, labor, and materials needed to complete all structural BMPs by the required deadlines.

9.    **Maintenance of BMP Structural Controls.**  Beginning on the Effective Date or the date of installation, each Defendant, as applicable, shall maintain and/or repair all structural BMPs at the Facility so that they are in good operating condition in accordance with Defendants' agreed-upon allocation of responsibility for such maintenance and/or repair.  Maintenance and repair activities shall be completed as soon as reasonably practicable.

10.    **Maintenance Logs**.  Each Defendant, as applicable, shall prepare and maintain a log of BMP inspections, maintenance, and/or cleaning activities required to be implemented by that Defendant under Sections IV and V, respectively ("Maintenance Log"). The Maintenance Log shall indicate the staff who completed the maintenance activity and date and time when it was completed. The Maintenance Log shall be made available for inspection by Baykeeper at any site inspection or otherwise within five (5) business days of a written request by Baykeeper.

11.    **Equipment Maintenance; Vehicle Repair**.  Each Defendant, as applicable, shall maintain all petcoke loading equipment located at the Facility in good working condition and repair in accordance with Defendants' agreed-upon allocation of responsibility for such maintenance and/or repair.  With the exception of emergency repairs, Defendants shall not conduct any vehicle or movable equipment maintenance or repair at the Facility in outdoor, uncovered areas from which stormwater discharges during rainfall events, other than those areas, if any, that Valero has designated in its SWPPP as vehicle maintenance areas.

12.    **Sweeping Equipment.**  Valero or its designated contractors shall utilize vacuum trucks or $PM_{10}$ compliant sweepers (together "Vacuum Trucks or Sweepers") where cleaning of paved

surfaces at the Facility is required under Section IV of this Consent Decree.

13. **Employee Training.** Within thirty (30) days of the Effective Date, each Defendant, as applicable, shall each develop and implement a training program, as appropriate to its obligations under this Consent Decree, including any training materials needed for effective implementation of the training program, to ensure that (1) there are a sufficient number of employees and/or contractors delegated to achieve and maintain compliance with the Storm Water Permit, BAAQMD regulations, and/or this Consent Decree, and (2) these employees are properly trained to perform the required compliance activities, including their role in implementing the written instructions, including Operational Checksheets, and meeting the regulations noted herein ("Training Program"). In addition, each Defendant's Training Program, as applicable, shall meet the following requirements, as relevant to their respective obligations under this Agreement:

a. Familiarize all employees and contractors at the Facility whose job responsibilities involve petcoke transfer and loading operations at the Facility with the requirements of the Storm Water Permit, applicable BAAQMD regulations, and this Consent Decree.

b. Provide appropriate and periodic training to all operational personnel within their control, including longshoremen who handle ship deck operations and other contractors or subcontractors who have been delegated duties covered by this Consent Decree. Where union or employment contracts do not allow implementation of said training, each Defendant, as applicable, shall use best efforts to ensure appropriate training within the constraints of those contracts.

c. Document all training procedures in writing.

d. Retain documentation of training required under this Consent Decree for 3 years that includes the names of the personnel trained, the type of training received, the hours spent training, the person or persons responsible for the training, and the date of the training.

e. Training shall be provided on an annual basis, or more frequently, with the objective of meeting the requirements of this Consent Decree. The training shall be conducted by a private consultant or a representative of Defendant who is familiar with the requirements of this Consent Decree, BAAQMD regulations pertaining to control of opacity, the California Fish & Game Code, the Clean Water Act, and the General Permit for the Facility. The training shall be repeated as necessary

[~~PROPOSED~~] CONSENT DECREE

3:22-cv-01294-WHO (LB)

to ensure that all such employees are familiar with applicable requirements. All new staff will receive this training before assuming responsibilities for implementing BMPs required by this Consent Decree.

14.    **Operational Checksheets and Standard Operating Procedures**.  In addition to the BMPs set forth in Sections IV and V below, Defendants shall each perform the additional tasks, as such are assigned and outlined in the "Operational Checksheets" attached in **Exhibit 1**, which shall include all of the steps associated with transfer of petcoke from the railcars into the storage silos through completion of vessel loading operations, including the actions to implement all BMPs set forth in this Agreement. Defendants shall also each adhere to all applicable Valero SOPs relating to petcoke transfer and vessel loading, as listed in **Exhibit 2**, as pertinent to their respective obligations under this Agreement. Any modifications to the Valero SOPs that could materially affect the potential for petcoke to be discharged into the water shall be provided by Valero to Baykeeper for review thirty (30) days prior to adoption. Baykeeper shall respond within 30 days of receipt of modifications with any comments. If Baykeeper's comments are not addressed by Valero within 30 days, Baykeeper may invoke the Dispute Resolution Procedure. A copy of the revised Valero SOPs, if any, shall be provided to APS.

15.    **Additional BMPs to Reduce and Prevent Petcoke Discharges.**    If, after implementation of the BMPs set forth in Sections IV and V below, as applicable, Valero and/or APS (or its successor) determine, through direct observation or on information and belief, that petcoke has been spilled or discharged from the petcoke loading equipment into the Carquinez Strait waters, in non-de minimis visible amounts during a petcoke loading event, Valero and APS shall review the implementation of existing BMPs, as applicable, and, if necessary, propose additional BMPs to reduce or prevent spills or discharges of petcoke to the water. For purposes of this Consent Decree, a "non-de minimis visible discharge" is an amount sufficient to be visible and identifiable as petcoke in the Carquinez Strait waters. The Settling Parties agree that the photographs attached as **Exhibit 3** constitute visible and identifiable petcoke in the Carquinez Strait waters for the purposes of the implementation of additional BMPs and for all other identification purposes necessary for implementation of the actions required by this Consent Decree.  In the event of a non-de minimis

visible discharge of petcoke into the Carquinez Strait waters during a loading event, the Party that first becomes aware of the discharge shall immediately notify the designated person(s) of each Settling Party to this Consent Decree via electronic mail and telephone.  For purposes of this paragraph, each Settling Party shall, within 10 days of the Effective Date, designate a person or persons who shall be provided such notification of a discharge.

16.    **Video Recordings.** All video recordings collected pursuant to this Consent Decree will be stored by the recording party and shared with the other Settling Parties in a readable format upon written request. In the event of a suspected non-de minimis visible discharge of petcoke into the water, the recording parties shall provide copies of all video recordings that were taken on the day in question to the other Settling Parties as soon thereafter as reasonably possible, without need for a written request.

17.    **Reports.** During the Term of this Consent Decree, each Settling Party shall provide to all other Settling Parties a copy of any and all documents submitted to the Regional Water Board, the State Water Board, BAAQMD, or any other government agency concerning the Facility's compliance with the Industrial General Permit or the BAAQMD PTO. Such documents and reports shall be transmitted via electronic mail to all other Settling Parties at the time the documents are submitted to the government agency.

### IV.    VALERO BEST MANAGEMENT PRACTICES

18.    Beginning on the Effective Date or such later date as specified, Valero, either on its own or through its contractor(s), shall implement the BMPs listed below. The BMPs required by this section shall be implemented in a manner that prevents, to the maximum extent practicable: (a) the entrainment of petcoke in storm water runoff from the Lower Silos Area, (b) the discharge of petcoke into Carquinez Strait in runoff from the Wharf Area, and (c) the non-de minimis visible discharge of petcoke into the water during ship loading events, as defined in Paragraph 15.  Within thirty (30) days of the Effective Date, Valero will commence the process of updating all Valero SOPs to address comments previously provided by Baykeeper and to implement the purposes of this Consent Decree, and Valero shall thereafter diligently complete that updating process as promptly as reasonably feasible.

**A.      Non-Structural BMPs to be implemented.**

19.      Within sixty (60) days of the Effective Date, and on a monthly basis thereafter, Valero or its designated contractor(s) shall inspect the entire Lower Silos Area, including without limitation the railroad car unloading area, railroad tracks, and surrounding ground surface within the subleased area, and remove any visible accumulations of petcoke that are observed using Vacuum Trucks or Sweepers. If such deposits of petcoke extend beyond the boundaries of the subleased area, APS shall grant access as necessary to Valero and/or its designated contractors to enable Valero to timely complete the cleanup in this area.

20.      Commencing on the Effective Date and every day thereafter on which railcar unloading takes place, Valero or its designated contractor(s) shall conduct an inspection of the railroad car unloading area and the railroad tracks within the subleased area, and remove any visible accumulations of petcoke using Vacuum Trucks or Sweepers. The inspection and cleanup activities may be conducted after rail car unloading operations have ceased for the day. If railcar unloading ends after dark, the inspection and cleanup may be conducted during the following business day.

21.      Commencing on the Effective Date, Valero shall conduct maintenance and repair of the railcar unloader system in accordance with Defendants' agreed-upon allocation of responsibility, as applicable, for maintenance and/or repair.  Maintenance and/or repairs shall be completed in accordance with applicable Valero SOPs and regulatory requirements as necessary to achieve the "non-de minimis visible discharge" standard.

22.      Commencing on the Effective Date, Valero shall conduct maintenance and repair of the Conveyor Transfer Points in accordance with Defendants' agreed-upon allocation of responsibility, as applicable, for maintenance and/or repair.  Maintenance and/or repairs shall be completed in accordance with applicable Valero SOPs and regulatory requirements as necessary to achieve the "non de minimis visible discharge" standard.

23.      Commencing on the Effective Date and thereafter, on any day on which petcoke is loaded into a ship, Valero or its designated contractor(s) shall inspect the area around the base of the loading tower and other areas within the footprint of Valero's sublease of the Wharf Area, and remove any visible accumulations of petcoke using Vacuum Trucks or Sweepers. If such deposits of petcoke

[~~PROPOSED~~] CONSENT DECREE

11                                3:22-cv-01294-WHO (LB)

extend beyond the boundaries of the sublease, APS shall grant access to Valero and its designated contractors as necessary to enable Valero to timely complete the cleanup outside the subleased area. The inspection and cleanup activities may be conducted after shiploading operations have ceased for the day provided  any petcoke deposits would not be expected to be mobilized into the waters of the Carquinez Strait, in which case the cleanup shall be conducted in sufficient time and to the extent necessary to remove the expected risk of mobilization.

24.    Commencing on the Effective Date and thereafter, Valero or its designated contractor(s) shall inspect and clean all exterior conveyors and components thereof that are used in connection with the petcoke loading operation as soon as reasonably practicable upon the completion of each shiploading event and in any event prior to the next shiploading event. Valero shall maintain and/or repair the petcoke transfer and loading equipment in accordance with Defendants' agreed-upon allocation of responsibility, as applicable, for maintenance and/or repair.  Maintenance and repairs shall be conducted as necessary to keep such equipment in a condition that reasonably prevents and/or reduces the potential for the release or discharge of petcoke during the transfer and loading process.

25.    Valero shall ensure that all Valero contractors perform their assigned tasks in the "Operational Checksheets" attached in **Exhibit 1**.

26.    Within thirty (30) days of the Effective Date and no later than one month prior to the start of the Wet Season (October 1) of each subsequent year, Valero shall inspect any filtration devices (e.g., straw wattles, hay bales, etc.) or other BMPs in the Lower Coke Silos Area that are intended to prevent petcoke from becoming entrained in stormwater that flows overland into Carquinez Strait to ensure that they are not in a condition that would materially impair their efficacy. Valero shall clean, repair, or replace such BMPs as soon as reasonably practicable, as needed to remove any accumulated dust, sediment, solids, or debris.

27.    Within thirty (30) days of the Effective Date and no later than one month prior to the start of the Wet Season (October 1) of each subsequent year, Valero shall inspect any filtration devices (e.g., straw wattles, hay bales, etc.) or other BMPs in the Wharf Area that are designed to prevent petcoke from becoming entrained in stormwater that may drain to Carquinez Strait through scuppers or sheetflow from the wharf. Valero shall clean, repair, or replace such BMPs as soon as reasonably

practicable, as needed to remove any accumulated dust, sediment, solids, or debris. Subject to the terms of its contract with the Longshoremen and pertinent regulatory, operational, and safety considerations, APS shall grant reasonable access to Valero and allow the placement of filtration devices or other similar BMPs in such locations along the wharf which are outside Valero's subleased area, as Valero determines are reasonably necessary to prevent discharge of petcoke into the Carquinez Strait. APS will make reasonable accommodation for such BMPs where operational concerns limit implementation.

28.     Commencing on the Effective Date and thereafter, on any day on which petcoke is loaded into a ship, Valero or its designated contractor(s) shall video record the initiation and the cessation of petcoke loading activities, for each petcoke loading event. All cameras will be used only in connection with the loading process.  Valero shall promptly provide APS and Baykeeper with a site map depicting the location of each camera. All recordings shall be securely stored and retained by Valero.

29.     Commencing on the Effective Date and through the term of the Consent Decree, Valero or its designated contractor(s) shall transmit via electronic mail ship loading schedule estimates to Baykeeper as soon as practical and known by Valero, including changes to such schedules. Such notices shall be sent to compliance@baykeeper.org. Valero's ship loading schedule is considered by Valero to be sensitive confidential business information ("CBI") and shall not be shared by Baykeeper outside of its employees or consultants directly involved in the oversight of this Consent Decree without prior written approval from Valero.  Baykeeper acknowledges that the ship loading schedule is subject to frequent change.

30.     <u>Amendment of Customer Contracts re Ship Deck Cleaning.</u> Within 60 days of the Effective Date, Valero shall review its contracts with petcoke purchasers and, upon renewal of such contracts, request that its customers (who are responsible for hiring the ships used to transport the petcoke) include provisions in their respective contracts with the shippers requiring ship personnel to implement BMPs to prevent the release or discharge of any petcoke that accumulates on the ship's deck or otherwise in areas under their control during the loading process, including each of the following:

a.      Installation of tarps over the ship's hold in accordance with Valero SOP DS-NP003, Appendix H prior to commencement of ship loading and monitor to ensure that tarps remain securely in place during the entirety of the loading event;

b.      Cleaning the ship desk surface at least daily using an industrial vacuum sweeping device in accordance with Valero SOP DS-NP003, Appendix G, and collecting all deposits and placing them into the hold of the ship;

c.      Prohibiting the washing of petcoke into the water; and

d.      Maintain a written log of Ship Deck cleaning activities, including date, time, cleaning activity, and personnel conducting the cleaning.

**B.      Structural BMPs to be implemented.**

31.      Surfactant Application Engineering Evaluation and Report:

a.      Within ninety (90) days of the Effective Date, Valero shall conduct a technical review of the existing system used for application of surfactant to the petcoke and determine whether any modifications to the system, or use of alternative surfactants, are feasible and necessary to improve dust suppression.

b.      Within ninety (90) days of the Effective Date, Valero shall prepare a report discussing the results of the technical review which shall be promptly provided to Baykeeper for its review. Baykeeper shall respond within 30 days with any comments. If Baykeeper's comments are not addressed within 30 days, Baykeeper may invoke the Dispute Resolution Procedure.

c.      Within one hundred twenty (120) days after completion of the report, Valero shall initiate implementation of, and diligently pursue, any system improvements that were identified as a result of the evaluation.

32.      Petroleum Coke Unloader (loading operations from rail cars into silos):

a.      Within thirty (30) days of the Effective Date, Valero shall conduct a thorough inspection of the rail car unloader system and Valero shall ensure such repairs are made in accordance with Defendants' agreed-upon allocation of responsibility, as applicable, for maintenance and/or repair as soon as reasonably practicable so that all components are in good

working order and adequate to prevent spillage of petcoke during unloading operations.

b. Within thirty (30) days of the completion of any repairs to the rail car unloader system or implementation of improved operational methods, Valero shall provide Baykeeper with documentation and other information describing the changes that were made. Valero shall allow Baykeeper to inspect the newly installed equipment within thirty (30) days of such notice, at Baykeeper's written request.

33. <u>Silo to Conveyor Transfer Point</u>: Within thirty (30) days of the Effective Date, Valero shall conduct a thorough inspection of the silo to conveyor transfer point. Following completion of the inspection, and as soon as reasonably practicable thereafter, Valero shall repair any damaged components as needed so that they are in good working order and adequate to prevent the spillage of petcoke outside the silos building during transfer operations.

34. <u>Conveyor Loadout Point</u>: Within one hundred twenty (120) days of the Effective Date, Valero shall complete all necessary engineering work and shall diligently file and pursue all required local agency applications for permits and/or approvals needed to improve the conveyor and conveyor transfer point by installing a belly pan beneath this area, an additional scraper, and a system for removing material that accumulates in the belly pan, to minimize the potential for petcoke to be returned on the underside of the conveyor belt. Installation of such improvements shall occur as soon as reasonably practicable upon issuance of all required permits.

35. <u>Ship Loading Point</u>: If during the term of this Consent Decree, there are nine (9) or more instances in which a non-de minimis visible discharge of petcoke into the waters of the Carquinez Strait occurs during a ship loading event, as defined in Paragraph 15 of this Consent Decree, Valero and Baykeeper shall meet and confer in good faith regarding the actions to be taken that would be effective in eliminating future releases of petcoke into the water, which would be at Valero's expense, taking into account the environmental and community impacts of the non-de minimis visible discharges, and the technical and economic feasibility, and other relevant considerations. An illustrative example of one potential action which would satisfy this requirement is the installation by Valero of a dry fog system, similar to the system discussed by Baykeeper and Valero during settlement discussions, which would be at Valero's expense. If Baykeeper and Valero are unable to reach

agreement as to an appropriate action(s) to be taken, Baykeeper and Valero shall resolve the matter through the Dispute Resolution Procedure in this Consent Decree. In the event of court motion to determine whether such a dry fog system will be effective in eliminating future releases, Valero shall have the burden of demonstrating that the system will not be effective, in which case the installation shall not be required.

## V.    APS BEST MANAGEMENT PRACTICES

36.    Beginning on the Effective Date or such later date as specified, APS shall implement the BMPs listed below. The BMPs required by this section shall be implemented in a manner that achieves the "non-de minimis visible discharge" standard as defined in Paragraph 15, above.

**A.    Non-structural BMPs to be implemented.**

37.    APS shall be responsible for proper implementation of all Valero SOPs and the Operational Checksheet(s) applicable to APS' activities, as provided in **Exhibit 2** and **Exhibit 1**, respectively, as such may be updated from time to time in accordance with the provisions of this Consent Decree.

38.    From and after the Effective Date, APS shall comply with all requirements of the BAAQMD PTO for the Facility, including all BAAQMD regulations applicable to control of aerial coke emissions that have a potential to enter Carquinez Strait.

39.    Petroleum Coke Rail Unloader BMPs (Valero SOP DS-2.6, DS-NP001, DS-NP106, DS-NP107, DS-NP108). APS shall comply with the following in connection with the unloading of petcoke from rail cars into the silos:

a.    Provide pertinent Valero SOPs and Operational Checksheets to relevant APS Personnel that detail proper operation and maintenance procedures for the Petroleum Coke Unloader system, including those Valero SOPs that pertain to proper alignment of equipment, closing all rail cars after unloading, inspecting unloading chutes and seals, and ensuring doors and other access points where coke material might escape are sealed appropriately.

b.    Operate and/or maintain the railcar unloader system in accordance with Defendants' agreed-upon allocation of responsibility for maintenance and/or repair, as applicable to APS.  Maintenance and repairs shall be completed in accordance with applicable

Valero SOPs and Operational Checksheets, including those Valero SOPs that pertain to retention of required documentation and regulatory requirements to achieve the "non-de minimis visible discharge" standard.

        c.      Comply with BAAQMD Regulation 6, Rule 1 relating to opacity at the Petroleum Coke Unloader system.

        d.      Promptly report any spills of petcoke in the Lower Coke Silos Area to Valero and its designated contractor(s) for prompt cleanup or conduct such cleanup in accordance with Defendants' agreed-upon allocation of responsibility for cleanup, as applicable.

40.    Silo to Conveyor Transfer Points BMPs (Valero SOP Procedure DS-NP003n, Appendix N; DS-NP003A): APS shall comply with the following in connection with transfer of petcoke from the storage silos to the conveyor system:

        a.      Provide pertinent Valero SOPs and Operational Checksheets to relevant personnel that detail proper operation and maintenance procedures applicable to the transfer of petcoke from the silos to the lower conveyor, and from the lower conveyor to the overhead conveyor leading to the loading tower.

        b.      Operate and/or maintain the Conveyor Transfer Points in accordance with Defendants' agreed-upon allocation of responsibility for maintenance and/or repair, as applicable.  Maintenance and/or repairs shall be completed in accordance with applicable Valero SOPs, and Operational Checksheets including those pertaining to the retention of required documentation and regulatory requirements to achieve the "non-de minimis visible discharge" standard.

41.    Conveyor Loadout Point BMPs (Valero SOPs DS-2.7, DS-2.8, DS-NP003, Appendices A and B, DS-EP502; DS-EP503): APS shall comply with the following in connection with transfer of coke from the conveyor system to the loading arm:

        a.      Provide training, in accordance with applicable Valero SOPs and Operational Checksheets, on proper operation and maintenance procedures for water spray application at the Conveyor Loadout Point.

[PROPOSED] CONSENT DECREE

3:22-cv-01294-WHO (LB)

b.      Operate and/or maintain the Conveyor Loadout Point in accordance with Defendants' agreed-upon allocation of responsibility for maintenance and/or repair, as applicable.  Maintenance and/or repairs shall be completed in accordance with applicable Valero SOPs and Operational Checksheets, including retention of required documentation and regulatory requirements.

42.     Ship Loading Point BMPs (Valero SOPs DS-2.7, DS-2.8, DS-NP003, Appendices A and B, DS-EP502; DS-EP503, DS-NP003, Appendix O): APS shall comply with the following in connection with the loading of petcoke into ships:

a.      Provide all pertinent Valero SOPs and Operational Checksheets to relevant personnel for proper operation and maintenance of all loading equipment at the Ship Loading Point, including operational measures sufficient to achieve the "non-de minimis visible discharge" standard.

b.      Operate and/or maintain the Ship Loading Point in accordance with Defendants' agreed-upon allocation of responsibility for maintenance and/or repair, as applicable.  Maintenance and/or repairs shall be completed in accordance with applicable Valero SOPs and Operational Checksheets, including retention of required documentation and regulatory requirements.

c.      Comply with BAAQMD Regulation 6, Rule 1 relating to opacity.

d.      Temporarily suspend loading operations if fugitive emissions from operations exceed regulatory limits specified in Regulation BAAQMD 6-1-305 (visible particles) and comply with any orders of the U.S. Coast Guard relating to shutdown of operations due to high winds or other factors.

43.     Amendment of Tariff Agreement: Within 60 days of the Effective Date, Benicia Port Terminal Company shall amend its Tariff Agreement to include a provision directed to all petcoke ships calling at the Benicia Port Terminal Company wharf that prohibits any deck cleaning or deck washing that has the potential to discharge any material into the Carquinez Strait. Said amendment shall also provide that washing petcoke or any other substance into the surrounding water is strictly prohibited.

[PROPOSED] CONSENT DECREE

3:22-cv-01294-WHO (LB)

1

## VI.    SAMPLING, MONITORING, INSPECTION & REPORTING

2    44.    **Sampling Program.**  Beginning with the 2024-2025 Reporting Year, Valero shall

collect and analyze stormwater samples from the discharge points identified in the Facility's SWPPP

according to the following schedule:

a.    <u>Lower Silos Area</u>.  Valero shall collect representative samples of storm water

discharged from the Lower Silos Area into the Carquinez Strait in accordance with the

requirements of its SWPPP.  Valero shall be required to sample discharges from a minimum

of four (4) Qualified Storm Events ("QSE"), as defined in Section XI.B. of the Industrial

Stormwater Permit, during this period.  Two samples should be taken between July 1 and

December 31, and two samples should be taken between January 1 and June 30. The samples

shall be visually observed for the presence of petcoke and the observations shall be recorded

on a Visual Observation Log.   Valero shall also photograph each sample and provide the

photographs to Baykeeper, along with copies of the Visual Observation Logs, within five (5)

business days. If petcoke is clearly visible in the sample, Valero shall promptly implement

additional BMPs as necessary to prevent discharges of petcoke to the water from the Lower

Silos Area.  For purposes of this Agreement, petcoke shall be considered "clearly visible" in a

sample if it is present in a discernable layer in the sample.  If Baykeeper disagrees with Valero's

determination of whether petcoke is "clearly visible" it shall notify Valero in writing within 30

days. If Baykeeper and Valero are unable to come to agreement on whether or not petcoke is

"clearly visible" in the sample within 30 days of receipt by Valero of Baykeeper's written

notice, Baykeeper may invoke the Dispute Resolution Procedure.

b.    <u>Wharf</u>.  Valero shall collect representative samples of stormwater that drains

from the Wharf Area into the Carquinez Strait, in accordance with the requirements of its

SWPPP. Valero shall be required to sample discharges from a minimum of four (4) QSEs.

When possible, these sampling events should occur at a time that coincides with shiploading

events. Two samples should be taken between July 1 and December 31, and two samples

should be taken between January 1 and June 30. The samples shall be visually observed for

the presence of petcoke and the observations shall be recorded on a Visual Observation Log.

Valero shall also photograph each sample and provide the photographs to Baykeeper, along with copies of the Visual Observation Logs, within five (5) business days. If petcoke is clearly visible in the sample, Valero shall promptly implement additional BMPs as necessary to prevent discharges of coke to the water from the Wharf Area. If Baykeeper disagrees with Valero's determination of whether petcoke is "clearly visible" it shall notify Valero in writing within 30 days. If Baykeeper and Valero are unable to come to agreement on whether or not petcoke is "clearly visible" in the sample within 30 days of receipt by Valero of Baykeeper's written notice, Baykeeper may invoke the Dispute Resolution Procedure.

c.      If Valero is unable to take the samples from any discharge point during any QSEs in the first half of the Reporting Year or the two (2) QSEs of the second half of the Reporting Year, Valero shall continue to sample during subsequent QSE until four (4) samples have been collected from all discharge points in that year.

d.      In the event that Valero is unable to collect four (4) samples in a Reporting Year, Valero shall explain in writing in the End-of-Season Summary under Paragraph 44.k why it was unable to collect the required sample(s).

e.      During the term of this Consent Decree, Valero shall collect samples from the sampling and observations points identified in the SWPPP.

f.      Each stormwater sample must be analyzed for the presence of each of the parameters listed in Table 1 below; provided however, that under no circumstance shall an exceedance of a Target Level be considered a violation of this Consent Decree, the Industrial General Permit, or the Clean Water Act.

| Table 1: Year 1 Target Levels | | | |
|---|---|---|---|
| Parameter | Units | Target Level (Average) | Instantaneous Target Level |
| Total Suspended Solids (TSS) | mg/L | 100 | 400 |
| Oil and Grease (O&G) | mg/L | 15 | 25 |
| pH | pH units | | Less than 6.0 Greater than 9.0 |
| Nickel (Ni) | mg/L | 1.02 | |
| Vanadium | mg/L | 0.1 | |

g.    **Certified Lab**: Except for pH samples, Valero shall have all stormwater samples collected pursuant to this Consent Decree delivered to a California state certified environmental laboratory for analysis within the time needed for analysis within laboratory method allowable hold times. The laboratory shall thereafter conduct analysis sufficient to detect individual constituents at or below the Target Levels set forth in Table 1.

h.    **Sample Result Reporting**: After the Effective Date, Valero shall provide complete results from sampling and analysis to Baykeeper and to SMARTS within thirty (30) days of receipt of the laboratory report from each sampling event.

i.    **Rain Gauge**: Valero has installed and operates a recording rain gauge capable of continuously recording rainfall in the vicinity of the Facility to 0.01 inches. Valero shall maintain the rain gauge in accordance with manufacturers' recommendations, maintain records of all maintenance, and provide maintenance and rainfall records within fourteen (14) days of a written request by Baykeeper.

j.    **Wind Gauge**: Valero has installed and operates a recording wind gauge capable of continuously recording windspeed in the vicinity of the Facility.  Valero shall maintain the wind gauge in accordance with manufacturers' recommendations, maintain records of all maintenance, and provide maintenance and wind speed records within fourteen (14) days of a written request by Baykeeper.

k.    **End-of-Season Summary**: By July 15 following each Reporting Year that occurs during the term of this Consent Decree, Valero shall prepare and send to Baykeeper an End-of-Season Summary that includes: (1) a summary chart with all of the sample results from the previous Reporting Year  including the constituent concentration(s) from sample(s) collected at the Facility exceeding the Target Levels in Table 1 ("Exceedance(s)"); and (2) identification of any new BMP(s) that Valero has implemented or will implement not already discussed in a prior End-of-Season Summary or Action Plan for the immediately previous Reporting Year. Valero may submit a copy of its Annual Report required under the Industrial General Permit in lieu of the End-of-Season Summary so long as the Annual Report meets the requirements of this section.

[~~PROPOSED~~] CONSENT DECREE

3:22-cv-01294-WHO (LB)

45. **Action Plan.**

   a. <u>For TSS, O&G, pH, and Nickel</u>. If the average results of any two samples collected in the Lower Silos Area, or the average results of any two samples collected in the Wharf Area, exceed the annual Target Level in Table 1 for one or more parameters, or if any two results from the Wharf Area or any two results from the Lower Silos Area exceed the instantaneous limits in Table 1, Valero shall submit an Action Plan in addition to an End-of-Season Summary by July 15 to address such exceedances. If Valero is required to prepare an Exceedance Response Plan (ERA) under the Industrial General Permit, the ERA may be submitted in lieu of an Action Plan so long as it meets the requirements of Paragraph 45.c. below.

   b. <u>For Vanadium.</u> In the event the concentration of vanadium in the average of any two samples exceeds the target level, Baykeeper and Valero shall meet-and-confer with respect to the sampling results and whether any additional or enhanced BMPs are needed to reduce vanadium concentrations in stormwater. If Baykeeper and Valero are unable to reach agreement, either party may invoke the Dispute Resolution Procedure, the outcome of which shall determine the need for an Action Plan for vanadium.

   c. <u>Contents of Action Plan</u>: If an Action Plan is required under Paragraph 45.a. or 45.b, it shall include the following:

   i. The possible sources of the Exceedance(s) during the applicable Reporting Year;

   ii. A proposal for and evaluation of new site-specific BMPs designed to reduce the potential for Exceedance(s) to occur in the future;

   iii. Data, drawings, and other design rationale demonstrating that the proposed site-specific BMPs; and

   iv. A schedule to implement any revised and/or additional BMPs by the earliest practicable time, and no later than the next October 1 where feasible.

   v. In any Action Plan, Valero shall consider appropriate structural BMPs as necessary to adequately address its Exceedances.

46.     **Baykeeper Review of Action/ERA Plan.**  Baykeeper shall have thirty (30) days from receipt to propose revisions to an Action/ERA Plan, which may be extended an additional 15 days by agreement of the Settling Parties. Within thirty (30) days of receiving Baykeeper's proposed revisions, Valero shall consider each of Baykeeper's recommended revisions to the Action/ERA Plan and accept them or timely request to meet and confer, in accordance with the Dispute Resolution Procedure. Valero shall revise the Action/ERA Plan in a manner consistent with the outcome of the Dispute Resolution Procedure.

47.     **Implementation of Action/ERA Plan.**  Valero shall implement the Action/ERA Plan described in Paragraphs 45 and 46 as an obligation of this Consent Decree.

a.     Valero shall diligently file and pursue all required local agency applications for permits and/or approvals for the BMPs included in any Action/ERA Plan. Valero shall further diligently pursue the procurement of contractors, labor, and materials to complete all BMPs by the October 1 deadline in Paragraph 45.c.iv (Action Plan) or as soon thereafter all required permits are obtained.

b.     Within thirty (30) days after BMPs set forth in an Action/ERA Plan pursuant to this Consent Decree are implemented, Valero shall revise the pertinent SWPPP and Site Map to include all BMP revisions or additions intended to reduce Exceedance(s) in stormwater and not otherwise already implemented and included in the SWPPP or Site Map and shall provide Baykeeper with a copy of such revised SWPPP.

c.     Nothing herein shall prevent Valero from revising its SWPPP or Site Map following expiration of this Consent Decree.

48.     **Employee Training**.  The Training Program shall require specific training to include at least the following:

a.     <u>Non-Storm Water Discharge Training</u>. Valero shall train all employees whose job duties relate to petcoke loading operations at the Facility on the Storm Water Permit's prohibition of non-storm water discharges, so that employees know what non-storm water discharges are and how to detect them and prevent them;

b. <u>BMP Training</u>. Valero shall train all employees whose job duties relate to petcoke loading operations at the Facility on BMP implementation and maintenance to ensure that BMPs are implemented effectively to prevent the discharge of pollutants or the exposure of pollutants to water, to prevent the discharge of contaminated water, and to ensure the proper treatment of storm water at the Facility;

c. <u>Storm Water Sampling Training</u>. Valero shall designate an adequate number of employees to collect storm water samples from each discharge point as required by this Consent Decree and/or the Storm Water Permit. The training shall include the proper sampling protocols, including chain of custody requirements, to ensure water samples are properly collected, stored, and submitted to a certified laboratory; and

d. <u>Visual Observation Training</u>. The Defendants shall provide training to all individuals performing visual observations at the Facility pursuant to the Storm Water Permit.

49. **Efforts to Reduce Exceedances**. During each Reporting Year, Valero has an ongoing obligation to evaluate the BMPs implemented at the Facility and included in this Consent Decree and any current or previous Action/ERA Plans, and, if the Target Levels are exceeded, make attempts to reduce the concentrations to at or below Target Levels for the remainder of the Reporting Year. Defendants shall use the results from subsequent stormwater samples as they become available to assist with their ongoing evaluation of the effectiveness of BMPs.

50. **Site Access.** During the Term of this Consent Decree, Defendants shall permit representatives of Baykeeper to perform up to two (2) physical inspections per year of the Facility during operating hours ("Site Inspections"). Baykeeper shall provide Defendants seventy-two (72) hours' written notice in advance of such Site Inspections. Baykeeper shall comply with all safety instructions provided to Baykeeper by Defendants' staff during all Site Inspections. During Site Inspections, Baykeeper shall be allowed to inspect and sample any stormwater discharges, inspect any logs, and take photos and/or videos.

51. **Amendment of SWPPP**. Within sixty (60) days of the Effective Date:

a. Valero shall amend its existing SWPPP and Site Map for the Facility as necessary to incorporate the requirements and BMPs set forth in Sections IV and V of this

[~~PROPOSED~~] CONSENT DECREE

3:22-cv-01294-WHO (LB)

Consent Decree and Section X of the Industrial Stormwater Permit, and submit them to Baykeeper for review. Baykeeper shall have thirty (30) days thereafter to provide comments on the amended SWPPP, including the Site Map, consistent with the requirements of the Consent Decree and the Industrial Stormwater Permit. Within thirty (30) days of receipt of Baykeeper's comments, Valero shall address the comments or timely request to meet and confer in accordance with the Dispute Resolution Procedure. Valero shall revise the SWPPP or Site Map in accordance with the outcome of the Dispute Resolution Procedure and upload the revised SWPPP or Site Map to SMARTS within thirty (30) days thereafter.

b.      The Site Map shall comply with the Industrial Stormwater Permit, Section X.E. Specifically, the Site Map shall clearly denote: (a) the topography and the direction of stormwater flow from the Wharf Area, (b) the boundaries of Valero's sublease, (c) known or suspected drop inlets, (d) ground type (pervious or impervious), (e) berms and the materials they are composed of, (f) any permanent structures and features, (g) discharge points, (h) sampling points, and (i) all other physical structures or items relevant under the Industrial Stormwater Permit and this Consent Decree.

c.      Compliance with the SWPPP for the Lower Silos Area and the Wharf Area shall at all times be a requirement of this Consent Decree.

52.     **Future Amendments to SWPPP.** During the term of the Consent Decree, Valero shall revise the Facility SWPPP and/or Site Map if there are any material changes to the Facility's operations, including but not limited to, moving a discharge or sampling point, modifying the topography of the site so as to change a drainage area, or removing or adding structural BMPs. Within forty-five (45) days of the material change, Valero shall revise the SWPPP and/or Site Map, and submit the revised SWPPP and/or Site Map to Baykeeper for review. Baykeeper may provide comments to or seek clarification of any revised SWPPP or Site Map within thirty (30) days of receipt. Within thirty (30) days thereafter, Valero shall address Baykeeper's comments or timely request to meet and confer in accordance with the Dispute Resolution Procedure. Valero shall revise the SWPPP or Site Map in accordance with the outcome of the Dispute Resolution Procedure and upload the revised SWPPP or Site Map to SMARTS within thirty (30) days of finalizing revisions in accordance with this Consent

1   Decree. Compliance with the SWPPP, as revised in accordance with this Paragraph, shall at all times

2   be a requirement of this Consent Decree.

3                       **VII.    MITIGATION, FEES AND COSTS**

4        53.   **Environmental Mitigation Funding.** As mitigation for the alleged violations set forth

5   in Baykeeper's 60-Day Notice and complaint, within thirty (30) days of the Effective Date, Defendants

6   shall pay the sum of two million, three hundred and eighty thousand dollars ($2,380,000) to the Rose

7   Foundation for Communities and the Environment ("Rose Foundation"), an environmental non-profit

8   organization, for projects that will benefit the San Francisco Bay-Delta watershed, to be awarded as

9   Baykeeper SF Bay-Delta Settlement Grants from within the California Watershed Protection Fund.

10  None of the Baykeeper SF Bay-Delta Settlement Grants will be awarded to Baykeeper. Of this amount,

11  one million eighty one thousand eight hundred twenty nine dollars ($1,081,829) shall be paid by

12  Valero, and one million two hundred ninety eight thousand one hundred seventy one dollars

13  ($1,298,171) shall be paid by the Amports Defendants. The Rose Foundation reports the grant funding

14  made with the tendered funds to DOJ and the Settling Parties, setting forth the recipient and purpose

15  of the funds. Payment shall be made to Rose Foundation for Communities and the Environment, 201

16  4th Street, Suite 102 Oakland, California 94607, with notice to Baykeeper.

17       54.   **Reimbursement of Fees and Costs.** Defendants shall reimburse Baykeeper in the

18  amount of eight hundred and seventy-five thousand dollars ($875,000) to help cover Baykeeper's

19  reasonable investigation, expert, and attorneys' fees and costs, and all other reasonable costs incurred

20  as a result of investigating the activities at the Facility related to this Consent Decree, bringing these

21  matters to Defendants' attention, and negotiating a resolution of this action. Of this amount, three

22  hundred thousand seven hundred thirty one dollars ($397,731) shall be paid by Valero, and four

23  hundred seventy seven thousand two hundred sixty nine dollars ($477,269) shall be paid by the

24  Amports Defendants. Defendants shall tender said payment, payable to Baykeeper, within thirty (30)

25  days of the Effective Date.

26       55.   **Compliance Monitoring Funds.** Defendants shall initially provide to Baykeeper

27  forty-five thousand dollars ($45,000) for costs and fees associated with monitoring Defendants'

28  compliance with this Consent Decree through the termination date of this agreement. Of this amount,

twenty thousand four hundred fifty five dollars ($20,455) shall be paid by Valero, and twenty four thousand five hundred forty five dollars ($24,545) shall be paid by the Amports Defendants. The total compliance monitoring fund payment shall be made payable to Baykeeper within thirty (30) days after the Effective Date.

### VIII.   DISPUTE RESOLUTION AND STIPULATED PAYMENTS

56.   **Dispute Resolution.** If a dispute under this Consent Decree arises or the Settling Parties believe that a breach of this Consent Decree has occurred, they shall follow the following Dispute Resolution Procedure:

a.   The Settling Parties shall schedule a meet and confer within fifteen (15) business days of receiving written notification from one or more of the Settling Parties of a request for a meeting to determine whether a violation of this Consent Decree has occurred and to develop a mutually-agreeable plan, including implementation dates, to resolve the dispute.

b.   If the Settling Parties fail to meet and confer or the meet and confer does not resolve the issue, after at least ten (10) business days have passed after the meet and confer occurred or should have occurred, any Settling Party shall be entitled to all rights and remedies under the law, including bringing a motion before the United States District Court for the Northern District of California for the limited purpose of enforcing the terms of this Consent Decree.  The Settling Parties agree disputes will be resolved based on a preponderance of the evidence.

c.   The Settling Parties shall be entitled to seek reasonable fees and costs incurred in any such action to enforce the terms of this Consent Decree pursuant to the provisions set forth in the Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), and applicable case law interpreting such provisions.

57.   **Stipulated Payments.** Baykeeper recognizes that each Defendant has separate and distinct obligations under this Consent Decree. Accordingly, each Defendant, as applicable based on the particular obligation at issue, or as determined by the Court, shall pay the following stipulated payments during the Term of this Consent Decree for any failures listed below in a. – d. if after thirty

(30) days' written notice by Baykeeper such failure is not cured by that Responsible Defendant as determined pursuant Paragraph 57.g. Stipulated penalties shall begin to accrue on the 31st day following notice unless the failure has been cured:

        a.      Valero shall pay $500 for each failure to collect a sample required under this Consent Decree;

        b.      The Responsible Defendant shall pay $250 per day after the due date for each failure to timely submit any document, report or other communication required in this Consent Decree;

        c.      The Responsible Defendant shall pay $250 per day for every business day (Monday through Friday, excluding state and federal holidays) past the due date that the Defendant subject to the stipulated payment fails to submit any payments due under Paragraphs 53-55 and 57 of this Consent Decree.

        d.      The Responsible Defendant shall pay $250 per day for every day past the due date that the Defendant subject to the stipulated payment fails to implement a BMP required by this Consent Decree.

        e.      For each instance in which a non-de minimis visible amount of petcoke is deposited into the waters of the Carquinez Strait during a ship loading event, as defined in Paragraph 15 of this Consent Decree, and as observed by a Settling Party or documented by Valero's video monitoring and/or other photographic or video evidence obtained or provided by the Settling Parties, the Responsible Defendant(s) as determined below shall  pay the following stipulated payments:

                Instances 1 to 3: $5,000 per discharge;

                Instances 4-6: $10,000 per discharge;

                Instances 7-10: $15,000 per discharge;

                Instances 11 and beyond: $25,000 per discharge

        f.      Any stipulated payments described above shall be paid within sixty (60) days of notification of the failure to comply (and having failed to cure), made out to Rose Foundation for Communities and the Environment, 201 4th Street, Suite 102 Oakland,

California 94607, with a copy of payment sent concurrently to Baykeeper. Stipulated payment funds will be used by the Rose Foundation to fund projects that benefit the water quality in the San Francisco Bay-Delta watershed, with acknowledgment that project grants are coming from the SF Baykeeper Bay-Delta fund and that none of those funds will be granted to Baykeeper.

g.    <u>Determination of Responsible Defendant</u>.  For purposes of this subparagraph, Defendants shall use best efforts to determine the cause of the discharge and the Responsible Defendant. If APS and Valero are unable to reach agreement on the cause of a discharge, or if both APS and Valero share responsibility for the discharge, the stipulated penalty shall be split equally by APS and Valero.  Payment shall be made in compliance with Paragraph 57.f. notwithstanding this subparagraph. Nothing herein shall prevent either APS or Valero from seeking reimbursement from the other with respect to such payments. Any disputes between Defendants under this subparagraph shall be resolved through the Dispute Resolution Procedure of this Consent Decree.

## IX.    JURISDICTION OVER SETTLING PARTIES AND SUBJECT MATTER OF CONSENT DECREE

58.    **Jurisdiction**. For the purposes of this Consent Decree, the Settling Parties stipulate that the United States District Court of California, Northern District of California, has jurisdiction over the Settling Parties and subject matter of this Consent Decree. The Settling Parties stipulate that venue is appropriate in the Northern District of California and that any Settling Party has standing to bring any subsequent action or motion pursuant to the Dispute Resolution Procedure herein.

59.    **Jurisdiction to Enforce Consent Decree**. The Court referenced above shall retain jurisdiction over the Settling Parties and subject matter of this Consent Decree for the purpose of adjudicating all disputes among the Settling Parties that may arise under the provisions of this Consent Decree. The Court shall have the power to enforce this Consent Decree with all available legal and equitable remedies.

60.    **Submission of Consent Decree to DOJ**. Within three (3) business days of receiving all of the Settling Parties' signatures to this Consent Decree, Baykeeper shall submit this Consent Decree to DOJ and EPA for agency review consistent with 40 C.F.R. § 135.5. The agency review

period expires forty-five (45) calendar days after receipt by DOJ, evidenced by correspondence from DOJ establishing the review period. In the event DOJ comments negatively on the provisions of this Consent Decree, the Settling Parties agree to meet and confer to attempt to resolve the issues raised by DOJ. If the Settling Parties cannot reach agreement on resolution of the issues raised by the DOJ, the Consent Decree signed by all parties shall be submitted to the Court for entry.

## X.    WAIVER AND RELEASES

61.    **Baykeeper Waiver and Release of Noticed Parties.** Baykeeper, on its own behalf and on behalf of its officers, directors, employees, parents, subsidiaries, affiliates and each of their successors and assigns releases Defendants, and their officers, directors, employees, parents, subsidiaries, affiliates, successors or assigns, agents, attorneys and other representatives, to the full extent permitted by law, from and waives all claims raised in, arising from, or pertaining to the 60-Day Notice and complaint, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses, or any other sum incurred or claimed, except as expressly provided in this Consent Decree.

62.    **Defendants' Waiver and Release of Baykeeper.** Defendants, on their own behalf and on behalf of their officers, directors, employees, parents, subsidiaries, affiliates, or their successors or assigns release Baykeeper and its officers, directors, employees, parents, subsidiaries, affiliates, successors or assigns, agents, attorneys and other representatives, to the full extent permitted by law, from, and waive all claims which arise from or pertain to, the 60-Day Notice and complaint, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed, except as expressly provided in this Consent Decree.

## XI.    MISCELLANEOUS PROVISIONS

63.    **Execution in Counterparts.** This Consent Decree may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document.

64.    **Signatures.** The Settling Parties' signatures to this Consent Decree transmitted by facsimile or electronic mail transmission shall be deemed binding.

65.    **Construction.** The language in all parts of this Consent Decree, unless otherwise stated, shall be construed according to its plain and ordinary meaning. The captions and paragraph

headings used in this Consent Decree are for reference only and shall not affect the construction of this Consent Decree.

66. **Authority to Sign.** The undersigned are authorized to execute this Consent Decree on behalf of their respective Settling Party and have read, understood and agreed to all of the terms and conditions of this Consent Decree.

67. **Integrated Consent Decree.** All agreements, covenants, representations and warranties, express or implied, oral or written, of the Settling Parties concerning the subject matter of this Consent Decree are contained herein. The Parties expressly disclaim reliance on any representations, warranties, statements or information not set forth within this Consent Decree. Further, nothing herein shall alter or affect the obligations between Defendants under their separate Work Agreement, the Valero/APS Sublease, or any other existing contract(s) or agreement(s) between Valero and the Amports Defendants.

68. **Severability.** In the event that any of the provisions of this Consent Decree are held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

69. **Choice of Law.** This Consent Decree shall be governed by the laws of the United States or, where applicable, the laws of the State of California.

70. **Full Settlement.** This Consent Decree constitutes a full and final settlement of all alleged violations described in the 60-Day Notice up to and through the Effective Date and shall further resolve all matters for which a stipulated penalty is paid pursuant the provisions of this Consent Decree.

71. **Effect of Consent Decree.** Compliance with this Consent Decree does not assure that Defendants are in ongoing compliance with the Industrial Stormwater Permit, Clean Water Act, California's Fish and Game Code, BAAQMD Permits, or any other law, rule, or regulation. However, during the term of this Consent Decree, Baykeeper's sole remedy for violations of the Clean Water Act, California Fish & Game Code § 5650, and/or the Industrial General Permit relating to or arising out of petcoke operations at the Facility shall be through enforcement of this Consent Decree.

72. **Negotiated Agreement.** The Settling Parties have negotiated this Consent Decree, and agree that it shall not be construed against the Settling Party preparing it, but shall be construed as if

the Settling Parties jointly prepared this Consent Decree, and any uncertainty and ambiguity shall not be interpreted against any one Settling Party.

73. **Modification of the Agreement.** This Consent Decree, and any provisions herein, may not be changed, waived, or discharged unless by a written instrument signed by each of the Settling Parties.

74. **Assignment.** Subject only to the express restrictions contained in this Consent Decree, all of the rights, duties, and obligations contained in this Consent Decree shall inure to the benefit of and be binding upon the Settling Parties, and their successors and assigns.

75. **Notices and Submissions.** Any notices or documents required or provided for by this Consent Decree or related thereto that are to be provided to Baykeeper pursuant to this Consent Decree shall be, to the extent feasible, sent via electronic mail transmission to the e-mail address listed below or, if electronic mail transmission is not feasible, via certified U.S. Mail with return receipt, or by hand delivery to the following address:

> San Francisco Baykeeper
> Attention: Eric Buescher
> 1736 Franklin Street, Suite 800
> Oakland, California 94612
> E-mail: eric@baykeeper.org
>                compliance@baykeeper.org

> With a copy to:

> Robert S. Perlmutter
> Shute, Mihaly & Weinberger LLP
> 396 Hayes Street
> San Francisco, California 94102
> E-mail:  perlmutter@smwlaw.com

Unless requested otherwise by Defendants, any notices or documents required or provided for by this Consent Decree or related thereto that are to be provided to Defendants pursuant to this Consent Decree shall, to the extent feasible, be provided by electronic mail transmission to the e-mail addresses listed below, or, if electronic mail transmission is not feasible, by certified U.S. Mail with return receipt, or by hand delivery to the addresses below:

For Valero:

        Parker Wilson, Esq.
        Vice President of Regulatory Law
        Valero Refining Company - California
        San Antonio, TX
        parker.wilson@valero.com

        With a copy to:

        Margaret Rosegay
        Pillsbury Winthrop Shaw Pittman LLP
        Four Embarcadero Center, 22nd Floor
        San Francisco, CA 94111
        margaret.rosegay@pillsburylaw.com

For Amports:

        Attention: Jacob S. Brown
        AMPORTS, Inc.
        Chief Financial Officer
        10060 Skinner Lake Drive, Suite 205
        Jacksonville, Florida 322246
        Email: Jakebrown@amports.com

        With a copy to:

        Therese Y. Cannata
        Cannata, O'Toole & Olson LLP
        100 Pine Street, Suite 350
        San Francisco, California. 94111
        Email: tcannata@cofolaw.com

Notifications of communications shall be deemed submitted on the date that they are emailed, or postmarked and sent by first-class mail or deposited with an overnight mail/delivery service. Any changes of address or addressees shall be communicated in the manner described above for giving notices.

76.    **Deadlines Falling on Non-Business Days.** Any deadlines relating to this Consent Decree which fall on the weekend or on a federal holiday shall be extended to the following business day.

77.    **Impossibility of Performance.** No Settling Party shall be considered to be in default in the performance of any of its obligations under this Consent Decree when performance becomes

impossible due to circumstances beyond the Settling Party's control, including without limitation any act of God, act of war or terrorism, fire, earthquake, and flood. "Circumstances beyond the Settling Party's control" shall not include normal inclement weather, economic hardship, or inability to pay. Any Settling Party seeking to rely upon this Paragraph shall have the burden of establishing that it could not reasonably have been expected to avoid, and which by exercise of due diligence has been unable to overcome, the impossibility of performance.

The Settling Parties hereto enter into this Consent Decree and submit it to the Court for its approval and entry as a final judgment.

1    IN WITNESS WHEREOF, the undersigned have executed this Consent Decree as of the date

2    first set forth below.

3    APPROVED AS TO CONTENT

4

5    SAN FRANCISCO BAYKEEPER

6    Date:  August 13, 2024

7    By: _____

8    Sejal Choksi-Chugh
     Executive Director, San Francisco Baykeeper
9

10   AMPORTS DEFENDANTS

11   Date: _____, 2024

12   By: _____

13
     Jacob S. Brown
14   Chief Financial Officer, Amports, Inc.

15   VALERO REFINING COMPANY - CALIFORNIA

16   Date: _____, 2024

17
18   By: _____

19   Lauren Bird, Vice President and General Manager

20

21

22

23

24

25

26

27

28

[PROPOSED] CONSENT DECREE

35                           3:22-cv-01294-WHO (LB)

1    IN WITNESS WHEREOF, the undersigned have executed this Consent Decree as of the date

2    first set forth below.

3    APPROVED AS TO CONTENT

4

5    SAN FRANCISCO BAYKEEPER

6    Date: _____, 2024

7    By: _____

8    Sejal Choksi-Chugh
     Executive Director, San Francisco Baykeeper
9

10   AMPORTS DEFENDANTS

11   Date: __8/13/2024__, 2024

12
13   By: *Jacob Brown* _____

14   Jacob S. Brown
     Chief Financial Officer, Amports, Inc.

15   VALERO REFINING COMPANY - CALIFORNIA

16
17   Date: _____, 2024

18   By: _____

19   Lauren Bird, Vice President and General Manager

20

21

22

23

24

25

26

27

28

1    IN WITNESS WHEREOF, the undersigned have executed this Consent Decree as of the date

2  first set forth below.

3  APPROVED AS TO CONTENT

4

5    SAN FRANCISCO BAYKEEPER

6    Date: _____, 2024

7    By: _____

8    Sejal Choksi-Chugh
9    Executive Director, San Francisco Baykeeper

10    AMPORTS DEFENDANTS

11    Date: _____, 2024

12
13    By: _____

14    Jacob S. Brown
      Chief Financial Officer, Amports, Inc.

15    VALERO REFINING COMPANY - CALIFORNIA

16
      Date: *August 15*, 2024
17
18    By: *Lauren K. Bird*

19    Lauren Bird, Vice President and General Manager

20

21

22

23

24

25

26

27

28

[PROPOSED] CONSENT DECREE

1    APPROVED AS TO FORM

2                                              SAN FRANCISCO BAYKEEPER

3

4    Dated: _____August 13_____, 2024         By: _____

5

6                                              Robert S. Perlmutter
                                               Attorney for Plaintiff

7                                              VALERO REFINING COMPANY- CALIFORNIA

8    Dated: _____August 13_____, 2024         By: _____
                                               Margaret Rosegay
9                                              Attorney for Defendant Valero

10

11                                             AMPORTS, INC.
                                               APS WEST COAST, INC.
12                                             BENICIA PORT TERMINAL COMPANY

13   Dated: _____August 13_____, 2024         By: _____
                                               Therese Y. Cannata
14                                             Attorney for Amports Defendants

15

16

17

18   **IT IS SO ORDERED.**                     UNITED STATES DISTRICT COURT

19                                             NORTHERN DISTRICT OF CALIFORNIA

20   Date: _____October 7, 2024_____         _____

21                                             William H. Orrick
                                               United States District Judge
22

23

24

25   1813235.6

26

27

28

---

[PROPOSED] CONSENT DECREE